**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**September 12, 2005**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

BRENDA C. ROBERTS,

       Plaintiff-Judgment Creditor-
Appellant,

v.

PATRICK PRINTUP, JR.,

       Defendant-Judgment Debtor,


SHELTER MUTUAL INSURANCE
COMPANY,

       Garnishee - Appellee.

No. 04-3141

(D.C. No. 02-CV-2333-CM)
(D. Kan.)

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 02-CV-23330-CM)**

---

David A. Hoffman (Donald W. Vasos, with him on the briefs), Vasos Law
Offices, Shawnee Mission, KS, for Plaintiff-Judgment Creditor-Appellant.

Craig C. Blumreich (Joel W. Riggs with him on the brief), Gehrt & Roberts,
Chtd., Topeka, KS, for Garnishee-Appellee.

---

Before **SEYMOUR, HOLLOWAY,** and **BRISCOE,** Circuit Judges.

---

**BRISCOE** , Circuit Judge.

Brenda Roberts, a judgment creditor, appeals the district court's grant of summary judgment to Shelter Mutual Insurance Company, garnishee. We exercise jurisdiction pursuant to 28 U.S.C. § 1291, affirm in part, reverse in part and remand.

*I. Facts and Procedural History*

On April 18, 2000, Roberts obtained insurance from Shelter for a newly-acquired vehicle that was titled and registered to both her and Patrick Printup, Jr., her sixteen-year old son. The insurance policy provided up to $25,000.00 in liability coverage per person for both property damage and bodily injury. The policy also included $4,500.00 in Personal Injury Protection (PIP). Roberts was listed as the insured with Printup listed as an insured driver.

On April 21, 2000, Printup was driving the vehicle and Roberts was a passenger when the brakes apparently failed. Printup drove approximately two blocks, then turned onto a downward sloped alley. He then lost control of the vehicle and struck a utility pole, chain link fence, and park bench. Roberts sustained bodily injuries, and city property was damaged. Roberts' medical bills exceeded $125,000.00. The city's property damage was valued at $250.00.

On April 25, 2000, Printup and/or Roberts contacted Shelter's 1-800 number. One or both of them reported Roberts was hurt in an accident and that Printup's brakes had failed. Shelter coded the accident as a "39," which means a

2

one-car collision with the insured at fault. App. at 44, 70, 187-88. Shelter assigned Lezlie Siebolt to work on the case. Siebolt's supervisor reviewed the file on May 4, 2000, noting Roberts might have a bodily injury claim, that PIP benefits would apply, and that medical information should be collected. Supervisor Gary Dauer indicated he was alerting Siebolt that she needed to consider a potential claim by Roberts against Printup. Dauer noted that Siebolt "need[ed] to look at the total $ for BI exposure." Id. at 59. "BI" appears to refer to the policy's liability bodily injury coverage. Id. at 39, 118.

On May 10, 2000, Siebolt took Roberts' statement. Roberts confirmed she was a passenger in a car driven by Printup, the brakes failed, and she was injured. Concerning Printup's actions, Roberts said "there was nothing really he could do though . . . he did everything I thought he should have." Id. at 64. Based upon this conversation with Roberts, Shelter did not at that time have reason to believe a liability claim against Printup was imminent or inevitable.

After this conversation with Roberts, Shelter notified its PIP unit of the incident. Shelter also paid the $250.00 property damage claim resulting from the accident. On June 23, 2000, Roberts submitted a PIP application to Shelter, and on August 21, 2000, Roberts signed medical authorizations related to her PIP claim. Shelter subsequently paid the first medical bills Roberts submitted, which immediately exhausted the PIP limits. Shelter then closed Roberts' PIP claim.

3

A factual dispute exists between Shelter and Roberts as to whether Roberts contacted Shelter prior to April 11, 2002, inquiring as to whether she had a right to assert a claim under the liability portion of the insurance policy. Roberts indicates a friend informed her that she might be entitled to additional money. Upon learning this, Roberts contacted Shelter. Roberts "asked about the money that -- the 25,000 bodily injury claim and she told me I was not entitled to it and that was the end of the conversation." Id. at 80. Shelter denies this conversation occurred.

On April 11, 2002, Roberts consulted with an attorney, which is when she learned the statute of limitations would soon bar filing a liability claim. Therefore, that same day, Roberts mailed a letter to Shelter's Topeka claims office offering to settle all claims for the $25,000 policy limits. Roberts' letter stated: "I am running out of time and need your answer within ten days." Id. at 220.

On April 16, 2002, Roberts filed a petition in state court. Because she did not want to pursue a lawsuit against her son and anticipated a prompt settlement, she directed the clerk to withhold issuance and service of a summons on Printup. However, when the time for accepting the offer expired without a response from Shelter regarding her offer, Roberts directed the clerk to proceed. Shelter hired a law firm to defend Printup. Printup sought and obtained removal of the action to

4

federal district court.

Roberts' demand letter was marked received on April 15 at Shelter's claims office. The claims office mail handler erroneously concluded the letter related to a PIP claim, which meant that it would be handled by Shelter's PIP department in Columbia, Missouri. On April 21, 2002, the letter was mailed to the PIP department, which in turn mailed Roberts' letter to the Kansas City claims department, where it was received on May 6, 2002.

On May 7, 2002, a Shelter supervisor contacted a Shelter litigation attorney regarding Roberts' demand. The two concluded that upon confirmation of the medical bills, Shelter would pay the limits of its liability coverage. That same day, Siebolt advised Roberts of Shelter's position and requested copies of her medical bills. Shortly thereafter, Shelter offered the $25,000 liability policy limits. Roberts declined the offer.

The district court subsequently approved a settlement and entered judgment in favor of Roberts and against Printup for $1,033,891.60. Printup assigned his rights to an action against Shelter for breach of contract to Roberts. Id. at 256. In return, Printup received a covenant from Roberts not to execute on Printup's personal assets. Shelter paid the $25,000.00 policy limits to Roberts, and the parties agreed that the acceptance of these monies did "not constitute a waiver or estoppel of [Roberts'] right to pursue collection from Shelter of the balance due

5

on the judgment." Id. at 255. Similarly, the parties agreed that Shelter's payment of these monies did "not constitute an admission that it breached its contract with Printup or acted negligently or in bad faith in the handling, investigation, negotiation, and resolution of the claim and lawsuit which Roberts has made and filed against Printup." Id. at 256. Roberts then filed a garnishment proceeding against Shelter to collect the balance of the judgment.

Roberts alleged that Shelter acted negligently or in bad faith in handling the claim against Printup in the following respects: (1) failure to comply with generally accepted standards of care in investigating the liability claim against Printup; (2) failure to properly evaluate the claim; (3) failure to properly document claim activity in the liability claim file; (4) failure to properly train and supervise claims personnel; (5) failure to give equal consideration to the interests of its insured; (6) failure to initiate negotiations for settlement when it was apparent that liability was reasonably clear and damages were in excess of policy limits; and (7) failure to accept, or even respond to, a time-sensitive policy limits offer of settlement allowing it to expire. The district court granted summary judgment to Shelter on all claims. Roberts appeals.

*II. Standard of Review*

We review the district court's grant of summary judgment *de novo*, applying the same legal standard used by the district court. Simms v. Okla. ex

6

rel. Dept. of Mental Health and Substance Abuse Servs., 165 F. 3d 1321, 1326 (10th Cir. 1999). Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). In applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party. Simms, 165 F. 3d at 1326.

Citing Land v. Roper Corp., 531 F. 2d 445 (10th Cir. 1976), Shelter asserts greater weight should be given to the district court's conclusions because a district court sitting in diversity is entitled to deference as to determinations regarding the law of the state in which it sits. We note, contrary to Shelter's argument, that the United States Supreme Court has held that "no form of appellate deference is acceptable," when we are asked to review a district court's determination of state law. Salve Regina College v. Russell, 499 U.S. 225, 238 (1991). Accordingly, "[a] federal district court's state-law determinations are entitled to no deference and are reviewed *de novo*." Woolard v. JLG Industries, Inc., 210 F. 3d 1158, 1168 (10th Cir. 2000).

*III. Negligence/Bad Faith of Insurer in Handling Claim Against Insured*

Roberts contends the district court erred in granting summary judgment as

7

to her claims[1] for negligence and bad faith[2] in Shelter's handling of her claims against Printup.

### 1. Prior to April 11, 2002

Roberts argues Shelter's obligation to negotiate a settlement in good faith and without negligence was triggered when the covered loss was reported on April 25, 2000 and/or when she presented a claim before April 11, 2002. The district court concluded that under Kansas law Shelter was "under no duty to initiate settlement negotiations prior to a claim being presented." Roberts v. Printup, 338 F.Supp.2d 1216, 1221 (D. Kan. 2004). Because the court concluded that "[t]here [wa]s nothing in the record evidencing that plaintiff made a bodily injury claim under the liability portion of the insurance policy prior to April 11, 2002[,]" it determined Shelter was entitled to summary judgment on Roberts' claims insofar as they related to conduct preceding Roberts' April 11 letter. Id. at 1220-21.

### A. Whether Duty to Settle Arises Through Reporting an Accident

Roberts contends a duty to settle arises before a claim is made through

---

[1] Printup assigned Roberts his rights to a contract claim against Shelter.

[2] Failure by an insurance company to act in good faith and without negligence in settling claims against its insured may result in the company becoming liable for an amount in excess of its policy limits. Glenn v. Fleming, 799 P.2d 79, 85 (Kan. 1990). "When an insurer determines whether to accept or reject an offer of settlement, it must give at least the same consideration to the interests of its insured as it does to its own interests." Id.

reporting a covered loss. Kansas imposes, under certain circumstances, a duty upon an insurer to initiate settlement negotiations even without an offer to settle being made by the claimant. Coleman v. Holecek, 542 F.2d 532, 537 (10th Cir. 1976). Rather than this duty hinging on the existence of a claimant's settlement offer, a Kansas insurer's "duty to settle arises if the carrier would initiate settlement negotiations on its own behalf were its potential liability equal to that of its insured." Id.

"[T]he duty to consider the insured's interest arises because of a claim for damages in excess of the policy limits, not because a settlement offer had been made." City of Hobbs v. Hartford Fire Ins. Co., 162 F. 3d 576, 584 (10th Cir. 1998). The existence of a claim for damages in excess of the policy limits creates a conflict of interest between the insured and the carrier that requires the carrier to give equal consideration to the interests of the insured. Coleman, 542 F.2d at 537. Further, under Kansas law, "[t]he insurer is obligated to initiate settlement negotiations regardless of the actions of the injured party." Smith v. Blackwell, 791 P.2d 1343, 1346 (Kan. Ct. App. 1989). This obligation results from "[t]he fiduciary relationship of the insurer and the insured[, which] imposes a duty upon the insurer to make reasonable efforts to negotiate a settlement of a claim against the insured." Id. However, the Kansas Supreme Court rejected the argument that "any time an insurance agent acquires knowledge of some injury to a policyholder

9

it becomes the company's duty to initiate an investigation and offer a settlement . . . without any claim being made . . . ." Sloan v. Employers Cas. Ins. Co., Dallas, Texas, 521 P.2d 249, 251 (Kan. 1974). Instead, the court found that "the insured has some duty to give notice to his company of his loss, **and** of the fact that he is making a claim under his policy, before the company is obligated to move." Id. (emphasis added). As noted by Shelter, "it seems odd to think that an insurer [(as part of its duty to the insured)] should beat the bushes to advise potential claimants to sue or make claims against their insured, especially if there is a possibility of an excess claim." Aplee. Br. at 14. The district court properly determined that an insurance company does not have a duty to the insured to initiate negotiations prior to a claim being made.

### B. Whether Roberts Presented a Claim Before April 11, 2002

Roberts contends that she presented a claim to Shelter on two occasions prior to April 11, 2002. First, she contends the initial report of the accident effectively included a claim. Second, she contends she effectively presented a claim when she contacted Shelter prior to April 11, 2002, to inquire about making a claim. The issue is whether either of these actions prior to April 11, 2002, constituted the presentment of a claim.

### i. Whether the Initial Reporting Included a Claim

Roberts contends the initial reporting included a claim. Roberts is correct

10

that "Shelter was treating the loss, and acting, as if a claim had been made." Aplt. Br. at 20. Roberts is also correct that a claim was made. In fact, two claims were actually made. However, Roberts asserted a PIP claim, not a liability claim, against Printup, and the other claim related to the property damage suffered by the city where the accident occurred. Shelter's response indicated its belief that these claims were made, but that a liability claim had not been made against Printup.[3]

On April 25, 2000, Roberts and/or Printup contacted Shelter to report an accident through Shelter's toll-free reporting line. By May 4, 2000, Shelter supervisor Dauer was aware that Roberts had a "potential" claim against Printup and wanted Seibolt to acquire all information possible about any bodily injury that Roberts may have suffered.

It is not necessary that a party initiate litigation by the filing of a complaint before the insurer's duty arises to act in good faith and without negligence in the handling of a claim against an insured. Smith v. Blackwell, 791 P. 2d 1343, 1346 (Kan. Ct. App. 1989). The court in Smith concluded that the insurer's receipt of "a pre-suit policy limits demand" imposed upon the insurer a duty of good faith and to act without negligence in handling such a claim against the insured even

---

[3] Roberts submitted an application for PIP benefits under her coverage, which was paid by Shelter in the amount of $4,500.00. Aplt. App. at 71, 75. Shelter also paid $250.00 to the City of Atchison for property damage. Id. 66-67, 69, 70.

though a suit had not been filed. Id. However, knowledge that a party may pursue a claim is not the equivalent of the Smith "pre-suit policy limit demand," nor does this knowledge create tension between the interests of the insurer and the insured, for at this point there is only the potential of a claim, not an actual claim to be settled. It is the insurer's control over approving a settlement and the tension between the interests of the insurer and the insured that necessitates the imposition of a duty upon the insurer to consider the interests of the insured. Bennett v. Conrady, 305 P.2d 823, 827 (Kan. 1957).

Applying those principles to the case at hand, we conclude that at the point when the accident was initially reported, and later when the accompanying PIP and city property damage claims were made, the interests of the insured and the insurer were not yet in conflict.

> *ii. Whether the pre-April 11, 2002 Liability Inquiry Constituted a Claim*

Roberts contends that she made a claim by calling Shelter before April 11, 2002, to inquire into making a bodily injury liability claim for the $25,000.00 policy limit. Shelter describes Roberts' call as a "phantom claim" and denies that Roberts had such a conversation with its representative. For purposes of summary judgment, however, we must accept Roberts' version of the facts and assume the call Roberts describes did in fact occur.

The district court concluded the call was not significant because Roberts

12

did not rely upon the information Shelter gave her. Specifically, the court held:

> There is a factual dispute as to whether [Roberts] contacted Shelter agent Hackerott to inquire whether she m[ight] have a claim. [Roberts] claims that the agent told her she had no claim, while Hackerott expressly denies such a conversation occurred. In any event, the court considers this factual dispute immaterial, because [Roberts] testified that she did not rely on Hackerott's information . . . .

Roberts, 338 F. Supp. 2d at 1220.

The district court's conclusion, which rested upon whether Roberts relied on Shelter's response, is flawed. Shelter owed its duty to act in good faith and without negligence to Printup, not Roberts. See Stewart v. Mitchell Transport, Inc., 197 F. Supp. 2d 1310, 1314-16 (D. Kan. 2002). Roberts' lack of reliance upon Shelter's assertion that she was not entitled to the $25,000.00 liability limit for her bodily injuries is immaterial to whether Shelter fulfilled its duty to Printup. See id. Shelter cannot avoid its potential responsibility to Printup to initiate settlement negotiations by falsely informing Roberts that she was not entitled to pursue such a claim.

When Roberts was informed by a friend that she might be entitled to additional money beyond the PIP benefits, Roberts contacted Shelter to inquire into this matter. Roberts was aware that she had a possible claim or might be entitled to recover on the basis of a liability claim involving her son. Roberts described her conversation with Hackerott in this way: "I asked her about the

13

money that -- that the 25,000 bodily injury claim and she told me I was not entitled to it and that was the end of the conversation." App. at 80. Again, viewing the facts in the light most favorable to Roberts, she endeavored to make a liability claim and was prevented from doing so by Shelter. The district court erred in determining as a matter of law no claim was presented prior to the April 11 letter. In turn, the district court erred in determining the insurer was under no duty to initiate settlement negotiations before receipt of Roberts' letter.

### 2. The April 11, 2002 Offer/Demand Letter

Roberts contends the district erred in granting summary judgment to Shelter on her claims that, as regards Printup, Shelter acted negligently or in bad faith in its handling of her policy limit offer. Roberts argues the district court improperly substituted its own standard of care. The district court determined as a matter of law that Shelter acted neither in bad faith or negligently in responding to Roberts' demand letter. The district court reached this conclusion after determining Shelter's actions constituted a mere clerical error and that even though Shelter's attempted acceptance of the offer was untimely, it was within thirty days of the letter being sent and within a couple of days of the letter being received by the proper Shelter supervisor. Roberts, 338 F. Supp. 2d at 1222.

"Whether an actor's conduct constitutes negligence is generally a factual question left to a jury." Gust v. Jones, 162 F. 3d 587, 593 (10th Cir. 1998). The

14

question should only be answered by the court "in rare cases where the evidence is susceptible to only one possible inference." Carl v. City of Overland Park, Kan., 65 F.3d 866, 869 (10th Cir. 1995).

On April 11, 2002, Roberts mailed a letter to Shelter's Topeka claims office to settle all claims for the $25,000.00 policy limit. Because the statute of limitations was due to expire on April 21, 2002, the offer had a ten-day time limit. Roberts provided Shelter with her address and telephone number. On April 16, 2002, Roberts filed an action against Printup in state court. She directed the clerk to withhold issuance and service of summons on Printup. When the time limit expired without contact from Shelter, Roberts directed service upon Printup.

The demand letter was marked "received" by Shelter's Topeka claims office on April 15. However, the mail handler in the Topeka office erroneously determined that the letter related to a PIP claim, which would be handled by Shelter's PIP department in Columbia, Missouri. On April 21, 2002, the date the offer expired, the letter was mailed to Columbia. On May 2, 2002, the PIP department mailed the Plaintiff's letter to the Kansas City claims department, where it was received on May 6, 2002. On May 7, 2002, a Shelter supervisor contacted a Shelter litigation attorney to discuss Roberts' demand letter. Both concluded that upon confirmation of the medical bills, Shelter would pay its policy limit, i.e., $25,000.00. That same day, in Shelter's first contact with

15

Roberts since she sent the letter, Siebolt requested copies of Roberts' medical bills and advised her of Shelter's position.  Shortly thereafter, Shelter offered to settle for the policy limit.

Roberts contends that, given the time sensitive nature of her offer, Shelter's Topeka claims office should have contacted the home office and requested a representative contact Roberts before April 21, 2002.  Roberts asserts that "[a]t very least, a Shelter representative should have immediately contacted [her] to acknowledge the receipt of her letter, requested any information that it needed to identify the claim, or if it needed additional time, request an extension of time to respond." Aplt. Br. at 29-30.  Roberts argues Shelter's failure to act amounts to negligence.

Kansas Administrative Regulation 40-1-34, with some exceptions not relevant here, adopts by reference the Unfair Claims Settlement Practices Model Regulation.  No exceptions are set forth as to § 6(a), which provides that "[e]very insurer, upon receiving notification of a claim shall, within ten working days, acknowledge the receipt of such notice unless payment is made within such period of time." UNFAIR CLAIMS SETTLEMENT PRACTICES MODEL REGULATION § 6(a), *available at* http://www.ksinsurance.org/company/Model_Laws/ Ref%2040-1-34.htm.  Shelter did not acknowledge the receipt of Roberts' demand letter within that time period.

16

The district court and Shelter emphasize that, once the letter arrived in possession of the appropriate Shelter employee, Shelter promptly responded. Roberts counters by contending she sent her claim to the proper office and Shelter mishandled it. She notes Shelter has no specific training for its mail handlers on dealing with time sensitive mail. Further, she notes that even though her letter referenced a liability claim against Printup and not a PIP claim, the letter was forwarded to the PIP department.

The district court concluded that Shelter's clerical error did not constitute bad faith. Because Roberts offers no evidence showing that Shelter's handling of the letter was done in bad faith, we agree with the district court and conclude it properly granted summary judgment as to Roberts' bad faith handling of her April 11 letter claim.[4]

We disagree, however, with the district court's conclusion that such an error could not, as a matter of law, constitute negligence, particularly in light of the UNFAIR CLAIMS SETTLEMENT PRACTICES MODEL REGULATION § 6(a). We conclude the district court erred in holding as a matter of law that Shelter's

---

[4] Insofar as Roberts' claims relate to Shelter's conduct prior to the April 11 letter, the district court granted summary judgment based on its determination that Shelter had no duty to Printup prior to the mailing of that letter. Because we conclude Shelter's duty arose prior to the April 11 letter, we reverse its grant of summary judgment. The district court left unanswered whether Roberts provided evidence that Shelter's conduct prior to the April 11 letter was negligent and/or in bad faith.

17

handling of Roberts' time sensitive demand letter was not negligent. We also

reject Shelter's assertion that it is not liable for any excess judgment because it

never refused to pay/accept Roberts' April 11, 2002, settlement demand. Since an

insurer can be liable for its handling of a claim against an insured even without an

offer to settle having been made, Coleman, 542 F. 2d at 536-38, it is illogical to

conclude that it cannot be liable simply because it never refused to pay a

settlement demand.[5]

---

[5] The district court determined that the factors outlined in Bollinger v. Nuss, 449 P.2d 502, 511 (1969), were "not applicable in these circumstances, since those factors are considered when deciding whether the insurer's refusal to settle constituted a breach of its duty to exercise good faith. Here, there was no refusal to settle." Roberts, 338 F. Supp. 2d at 1222 n. 5 (internal citations and quotation marks omitted). The district court read Bollinger too narrowly. The Kansas Supreme Court stated that "[t]he Bollinger factors relate to an insurer that has admitted coverage and assumed control of the defense and settlement, rather than an insurer that has denied coverage. However, those factors relating to the insurer's coverage decision are relevant." Associated Wholesale Grocers, Inc. v. Americold Corp., 934 P. 2d 65, 93 (Kan. 1997). The Bollinger court itself noted that "the question of liability depends upon the circumstances of the particular case and must be determined by taking into account the various factors present, rather than on the basis of any general statement or definition." Bollinger, 449 P. 2d at 512. In fact, the Bollinger court determined that several of the enumerated factors set forth in a California appellate court decision that it referenced were not applicable in the case before it. Id. A challenge to an insurer's handling of a claim requires an individualized approach in which the Bollinger factors can be considered insofar as they are relevant, which is the approach used in Bollinger itself. See Ins. Co. of North America v. Med. Protective Co., 768 F. 2d 315, 321-22 (10th Cir. 1985). The district court erred in concluding that Bollinger was not applicable merely because there was no refusal to settle in this case.

*IV. Conclusion*

We AFFIRM the district court's grant of summary judgment to Shelter as to the Roberts' claim that Shelter acted in bad faith in failing to accept, or even respond to, a time-sensitive policy limits offer of settlement allowing it to expire. We REVERSE the district court's grant of summary judgment to Shelter as to Roberts' claim of negligence for failing to accept, or even respond to, a time-sensitive policy limits offer of settlement allowing it to expire. We REVERSE the district court's grant of summary judgment to Shelter and remand for further proceedings as to Roberts' claims that Shelter violated its duty to the Printup by acting negligently and/or in bad faith by (1) failing to comply with generally accepted standards of care in investigating the liability claim against Printup, (2) failing to properly evaluate the claim, (3) failing to properly document claim activity in the liability claim file, (4) failing to properly train and supervise claims personnel, (5) failing to give equal consideration to the interests of its insured, and (6) failing to initiate negotiations for settlement when it was apparent that liability was reasonably clear and damages were in excess of policy limits.