**F I L E D**

**UNITED STATES COURT OF APPEALS**

**December 14, 2005**

**TENTH CIRCUIT**

LIBERTY MUTUAL INSURANCE
COMPANY, a Massachusetts
corporation; LIBERTY INSURANCE
CORPORATION, a Massachusetts
corporation,

      Plaintiffs-Counter-Defendants,

v.

CONTINENTAL INSURANCE
COMPANY, a New Hampshire
corporation; CNA INSURANCE
COMPANY, an Illinois corporation,

      Defendants.

      and

GEYSER PRODUCTS OF
WYOMING, L.L.C., a Wyoming
corporation; MICHAEL VANCE,

      Defendants-Counter-Claimants-
      Cross-Claimants - Appellants,

v.

AMERICAN NATIONAL FIRE
INSURANCE COMPANY, a New
York corporation,

      Defendant Cross-Defendant -
      Appellee,

      and

No. 04-8053
(D.C. No. 02-CV-1035-D)
(D. Wyo.)

7-UP BOTTLING COMPANY OF
SAN FRANCISCO,

     Cross-Defendant.

---

**ORDER AND JUDGMENT**[*]

---

Before **TACHA**, Chief Judge, **ANDERSON**, and **KELLY**, Circuit Judges.

---

Appellants Geyser Products of Wyoming, LLC and Michael Vance (collectively, "Geyser") appeal from the district court's grant of summary judgment in favor of Appellee American National Fire Insurance Company ("American") in a dispute turning on the scope of coverage of an American excess umbrella policy. Geyser seeks recovery under a judgment entered against American's insured, Seven-Up Bottling Company of San Francisco ("7-Up"), after a settlement of Geyser's claims for violations of the Lanham Act and unfair competition. We exercise jurisdiction under 28 U.S.C. § 1291, and affirm.

Background

This case arises from an underlying lawsuit between Geyser and 7-Up.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Geyser developed, manufactured and sold fruit-flavored water beverages. 7-Up contacted Geyser in 1995 about doing business together. 3 Jt. App. at 811; 5 Jt. App. at 1894-1895. Geyser and 7-Up entered into a Confidentiality Agreement, protecting the parties' formulas and methods, and a Franchise Agreement, providing that 7-Up would manufacture and distribute Geyser products. 3 Jt. App. at 811; 5 Jt. App. at 1902-1904.

Within a year, the relationship between 7-Up and Geyser had deteriorated. Roger Easley, 7-Up's President, believed Geyser's price increase for its concentrates was unreasonable. Aplee. Supp. App. at 23 (70). Subsequently, 7-Up developed "Aqua Ice," its own brand of flavored water beverages. 6 Jt. App. at 2350, 2376-2377, 2346-47; 1 Jt. App. at 108, 154-155. 7-Up ultimately terminated its relationship with Geyser, 6 Jt. App. at 2449, and continued to develop, market and sell Aqua Ice. 6 Jt. App. at 2454-2457; 1 Jt. App. at 111-113, 154-55. 7-Up expected that its own brand would take sales away from Geyser. Aplee. Supp. App. at 12 (97-99).

Geyser filed suit against 7-Up in Wyoming state court in November 1998 ("Underlying Case").[1] Geyser asserted claims for breach of contract, breach of

---

[1] 7-Up notified American of the lawsuit, by letter, on November 16, 2000. Three months later, 7-Up requested that American defend the Underlying Case. American declined because 7-Up's primary policies potentially covered the loss. 7-Up never notified American of claims asserted by Mike and Debra Vance, the Geyser founders, who were eventually added as plaintiffs. 7-Up never notified

fiduciary duty, violation of the Lanham Act, unfair competition, breach of the implied covenant of good faith and fair dealing and theft of trade secrets. 1 Jt. App. at 115-130. Geyser alleged in its amended complaint that 7-Up engaged in conduct to "[i]ntentionally destroy the market for Geyser Products in the Northern California territory"; that "7-Up intentionally 'killed' the market for Geyser Products"; that "[t]he actions taken by 7-Up were with the intent to economically harm [Geyser] and in their own self-interest with reckless disregard to the economic interests of [Geyser]"; and that "7-Up's conduct in misappropriating the Geyser Products trade secrets was willful and intentional." 1 Jt. App. at 125, 127, 128. Conspicuously absent from the complaint are allegations of negligence.

The parties attended mediation. Geyser and 7-Up settled the Underlying Case in June 2002. 3 Jt. App. at 812. Pursuant to the Settlement and Release Agreement ("Settlement") 7-Up stipulated as to liability for Lanham Act and unfair competition claims, with 7-Up acknowledging "that it acted negligently" and was therefore liable. 1 Jt. App. at 136-37, 153-57; 5 Jt. App. 2038. Under the Settlement, the parties agreed to have a trial on damages. 1 Jt. App. at 137-38. 7-Up agreed that it would "not seek to introduce evidence, testimony [sic] at such hearings other than to assert the terms" of the Settlement, "nor will it oppose related motions." Id. at 137. Geyser agreed not to execute upon any judgment

American of any mediation.

- 4 -

against 7-Up, and 7-Up agreed to assign all rights and claims under its insurance policies to Geyser. 1 Jt. App. at 138-39; 3 Jt. App. at 812-813. The agreed-to damages trial ensued and the Wyoming state court entered judgment against 7-Up for over $28 million. 1 Jt. App. at 159-160.

Geyser began its efforts to recover against 7-Up's insurers and reached settlement with CNA, holder of the relevant primary policy ("Primary Policy"). Per the settlement, CNA paid Geyser $750,000 of its $1,000,000 policy limit. Geyser informed American that this settlement exhausted the underlying insurance and triggered American's excess coverage. American denied coverage.

Geyser filed suit against American in federal district court. The parties filed cross-motions for summary judgment. The district court granted summary judgment in favor of American, and denied Geyer's motion for summary judgment. Specifically, the court concluded that (1) 7-Up's actions were conscious and deliberate (not accidental), and therefore were outside the scope of the policy and did not trigger coverage, and (2) Geyser did not exhaust the Primary Policy because it settled with CNA for an amount below the policy limits.

The district court held that 7-Up's actions did not fall within the "occurrence" language of the American policy. The "Coverage" section of the policy provides:

> [American] will pay those sums in excess of 'underlying insurance' or the retained limit that the 'Insured' becomes legally obligated to pay as damages because of 'injury' caused by an "occurrence" to which this policy applies.

2 Jt. App. at 636.

> "Injury" includes "Advertising Injury." Id. at 642.

> "Advertising Injury" means injury arising out of . . . [m]isappropriation of advertising ideas or style of doing business. Id.

> "Occurrence" means an accident . . . which occur[s] during the policy period which unexpectedly and unintentionally results in "injury." Id. at 650.

In holding that 7-Up's actions were outside the scope of the "Occurrence" provision, the district court rejected Geyser's argument that 7-Up acted "negligently," instead concluding that 7-Up made "deliberate and conscious decision[s]." 8 Jt. App. at 3153. The district court viewed the former as "nothing more than a square peg in a round hole" and "a collusive effort to avoid a potentially costly lawsuit by classifying 7-Up's conduct in such a way as to trigger coverage under a very large excess policy." 8 Jt. App. at 3160 (internal quotations omitted).

In this appeal, Geyser argues that the district court erred (1) by not applying the doctrine of functional exhaustion, (2) by not holding that American's "occurrence" provisions were void as illusory, ambiguous and internally inconsistent, and (3) by holding that 7-Up engaged in intentional acts excluded

- 6 -

under the policy. In addition, Geyser seeks certification on the questions of (1) whether California would follow functional exhaustion, (2) whether the American policy is ambiguous and illusory, and (3) whether the policy provides coverage for negligent advertising injury. American opposes the motion.

Discussion

As an initial matter, we will deny the motion to certify. The Tenth Circuit permits certification when state law allows. Cal. R. 29.8 provides that the California Supreme Court may grant certification if, on request of a Court of Appeals, "the decision could determine the outcome of a matter pending in the requested court" and "there is no controlling precedent." Certification may be warranted when the questions of law are "[n]ovel" and "unsettled." Copier v. Smith & Wesson Co., 138 F.3d 833, 839 (10th Cir. 1998) (internal citations and quotations omitted). As explained below, neither the functional exhaustion question nor the coverage for negligent acts is outcome determinative, and thus both are inappropriate for certification. See Cal. R. 29.8. California precedent provides sufficient guidance on whether the American policy is illusory. Moreover, we generally do not "certify questions to a state supreme court when the requesting party seeks certification only after having received an adverse decision from the district court." Enfield v. A.B. Chance Co., 228 F.3d 1245, 1255 (2000) (internal citations and quotations omitted).

We review the district court's grant of summary judgment de novo and we apply the same standard the district court applied. E.g. Roberts v. Printup, 422 F.3d 1211, 1214 (10th Cir. 2005). Summary judgment is appropriate where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue of any material fact." Fed. R. Civ. P. 56(c). We draw all reasonable inferences in favor of the non-moving party. Sierra Club v. El Paso Gold Mines, Inc., 421 F.3d 1133, 1146 (10th Cir. 2005). California state law applies. We review the district court's determinations of state law de novo. Roberts, 422 F.3d at 1215. Because we hold against Geyser on its other two grounds presented in this appeal, it is unnecessary to decide whether California would follow the doctrine of "functional exhaustion."

Geyser argues that the American policy is internally inconsistent, and is therefore ambiguous and illusory. Interpretation of an insurance policy is a question of law. Uhrich v. State Farm Fire & Cas. Co., 135 Cal. Rptr. 2d 131, 137 (Cal. Ct. App. 2003); Waller v. Truck Ins. Exchange, Inc., 900 P.2d 619, 627 (Cal. 1995). Like any other contract, we must give effect to the mutual intention of the parties at the time they entered into the agreement. Waller, 900 P.2d at 627; Mez Indus. Inc. v. Pac. Nat'l Ins. Co., 90 Cal. Rptr. 2d 721, 729-30 (Cal. Ct. App. 1999). The court looks to the plain language of the contract and its ordinary

meaning.  Id.  When a policy term is subject to more than one objectively reasonable interpretation, as a whole and in light of the circumstances of the case, a provision is ambiguous and should be construed against the insurer.  Mez Indus., 90 Cal. Rptr. 2d at 729-30.

Here, Geyser argues that the American policy is ambiguous and inconsistent because certain offenses which constitute "injury" under the policy involve intentional and willful conduct (e.g. slander, libel), yet covered occurrences under the policy must be accidental or unintentional.  Aplt. Br. at 33.  As such, Geyser argues that this policy must be construed against the insured.  A policy is only ambiguous if it is subject to more than one reasonable interpretation, from the standpoint of the insured at the time of contract.  Waller, 900 P.2d at 627.  California Insurance Code § 533, which by statute must be read into all insurance policies, J.C. Penney Cas. Ins. Co. v. M.K., 804 P.2d 689, 694 (Cal. 1991), renders Geyser's purported interpretation objectively unreasonable.[2]

Section 533 prohibits insurance coverage for any "willful act."  Downey Venture v. LMI Ins. Co., 78 Cal. Rptr. 2d 142, 154 & n.31 (Cal. Ct. App. 1998); California Cas. Management Co. v. Martocchio, 15 Cal. Rptr. 2d 277, 280 (Cal. Ct. App. 1992).  Parties cannot contract around § 533.  Downey, 78 Cal. Rptr. 2d

---

[2] California Insurance Code § 533 provides: "An insurer is not liable for a loss caused by the wilful act of the insured; but he is not exonerated by the negligence of the insured, or of the insured's agents or others."

- 9 -

at 154. Section 533 defines a willful act as "an act deliberately done for the express purpose of causing damage or intentionally performed with knowledge that damage is highly probable or substantially certain to result." Id. at 500 (quoting Shell Oil Co. v. Winterthur Swiss Ins. Co., 12 Cal. App. 4th 715, 742 (Cal. App. 1993)) (emphasis in original).

Geyser's argument that "7-Up did not and could not have intended the harm . . . from its misappropriation," Aplt. Reply Br. at 18, is unpersuasive. The test for "expected damage" is whether the insured knew or believed its conduct was substantially certain or highly likely to result in the kind of damage. Shell Oil, 15 Cal. Rptr. 2d at 835-36. Because 7-Up's actions were willful, § 533 precludes coverage.

Willful acts are intentional ones where the "harm is inherent in the act itself." Downey, 78 Cal. Rptr. 2d at 155 (internal citations and quotations omitted). The record reveals an intentional and purposeful design by 7-Up to steal Geyser's intellectual property and drive its products off the shelves. The fact that the parties' agreed that 7-Up would acknowledge it acted negligently is unavailing.[3] At the "damages hearing," Geyser's counsel argued:

---

[3] In Uhrich, the court determined that whether "negligence" or "willfulness" was pleaded was irrelevant to the question of whether the acts were covered. 135 Cal. Rptr. 2d at 139-40. Pleaded allegations and extrinsic facts against a backdrop of policy language define the scope of coverage. Id. Similarly here, a stipulation that liability would be predicated on negligence does not vitiate

- 10 -

- "Seven-up decid[ed] that we're going to create a knock off product, the heck with [Geyser]. That we have test marketed this product, we've seen how [] it works, we know how to make it. We've got your formulas, all of this . . . they can take this advertising, marketing and promotional information they gathered and use it . . . as they did to create the Aqua Ice product." 6 Jt. App. at 2305.

- "Seven-up goes and creates a knock off product using all of this information, taking the proprietorship knowledge, the marketing and the advertising . . . and they went out and violated the [Lanham Act] by copying the product and that's what we have an admission of liability for." Id. at 2306-07.

- "[Seven-Up has] admitted that they consciously and deliberately made the decision, a business decision to go forward and take this information and knock off their own product and they could obviously not have two of the same product on the shelves at the same time." Id. at 2308.

- "[T]his wasn't a decision by accident or by negligence, this was a decision that was deliberate and conscious, made as a business decision to create, market and advertise the product that became Aqua Ice." Id.

- "The decision, consciously and deliberately made by 7-Up to utilize its intellectual property, caused a loss of revenue stream (sic) very clearly and everything that flowed from it." Id. at 2309.

- "[W]hen you have some of this deliberate and conscious conduct where we have a decision that we're gonna dump Vance and Geyser and even though we promised we would not palm off, we're gonna go do it and we're going to unfairly compete from all this great information that's been provided to us. And that's what they went out and did. If this isn't a case for enhanced damages . . . there isn't one. . . . The same deliberate conduct in the tenth circuit is also a basis for award of attorney fees." Id. at 2321.

When counsel for 7-Up argued that the stipulation admitted negligent

---

evidence of intentional, willful conduct.

- 11 -

conduct and objected to Geyser counsel's continuous representation otherwise, Geyser's counsel attempted to "clarify": "I know what the stipulation said and the order about negligently [sic], but my point was that a [business] decision had to be made . . . it was a business decision, it was a deliberate and conscious decision that was made that they would terminate the agreement with Geyser and start selling, manufacturing, promotion, Aqua Ice." 6 Jt. App. at 2332-33. Although counsel all the while disclaimed a suggestion of intentional conduct, claiming it was merely a "business" decision, counsel's statements are telling.

We find it disingenuous to argue now that arguments of Geyser's counsel are no indication of what 7-Up expected or intended; and to seemingly argue now that an admission by 7-Up concerning intent to injure with precise monetary amounts would be required. This ignores the reality of the situation–having bought its peace, one would hardly expect 7-Up to provide such evidence. Besides, as the assignee of 7-Up's claim, the burden is on Geyser. Waller, 900 P.2d at 626.

California law holds that judicial admissions are binding. Uhrich, 135 Cal. Rptr. 2d at 141. These statements by Geyser were more than belief– "they were assertions intended to induce the court to grant" a particular money judgment in the underlying case. See id. These were "statements based on the evidence known to [Geyser and its counsel], not simply a subjective belief about [7-Up's]

- 12 -

motive." Id. Here, the factual contention that the conduct involved is mere negligence is inconsistent with the intentional and willful conduct emphasized at the damages trial, which resulted in a money judgment akin to a blank check. See Johnson v. Lindon City Corp., 405 F.3d 1065, 1070 (10th Cir. 2005) (discussing judicial estoppel); Uhrich, 135 Cal. Rptr. 2d at 141.

Mr. Vance, Geyser principal, also took the position that 7-Up acted willfully, under the definition of § 533:

- "During American's policy period 7-Up commenced development of its Aqua Ice product and took action to injure Geyser, and thereby Vance, by stopping its distribution of Geyser products as required and emptying its distributor's shelves to make room for Aqua Ice." 6 Jt. App. at 2167 (emphasis added).
- "[7-Up employee] Endow stated that 7-Up had replaced Geyser with another brand name and that the Geyser brand has been 'killed.'" Id. at 2168. "Mr. Endow's comment to me (Mike Vance) was that they killed our brand on purpose and quit distributing it. . . . So they cannibalized our brand and put in the other brand." Id. at 2341.

- "Generally, when 7-Up decided to misappropriate Geyser's product, damages started to accrue as Geyser products were removed from shelves, distribution slowed and was stopped and support for the products disappeared. Geyser's damages directly relate to Vance's personal damages." Id. at 2177.

- 7-Up used "bad faith in execution of the agreement, and basically walking on us as a very little person, a little company that is trying to exist." Id. at 2342. 7-Up used Geyser's quality and control manual– "the information that was gleaned from our formulations showed them how to engineer their own [product] that was so similar that it's disgusting to me." Id. at 2340.

These statements confirm the obvious: 7-Up's conduct was a willful attempt to

- 13 -

drive Geyser out of business and increase 7-Up's profits from the sale of a copied product. Vance was an 85% shareholder of Geyser. Id. at 2284. Vance's damages were the natural outgrowth of the damages to Geyser. Where the "defendant's act was both intentional and wrongful and the harm caused was inherent in or predictably resulted from the act," the act is willful and § 533 bars coverage. Downey, 78 Cal. Rptr. 2d at 155-56. The damages caused, even if not explicitly intended, were inherent in 7-Up's conduct. In Mez Industries, a case involving patent infringement, the court found that "[o]bviously, damage would flow in the form of a loss [to the plaintiff] and a gain to [the defendant] through the sale of its products. Plainly, such a result would necessarily have to be within [the defendant's] knowledge . . . This is enough to satisfy the requirements of section 533." Mez Indus., 90 Cal. Rptr. 2d at 736 (emphasis in original). Similarly, 7-Up intentionally used Geyser's confidential information to drive Geyser's products out of a specific market and use its own products as a replacement. The damages to Geyser and the Vances were inherent in 7-Up's desire to "kill" Geyser products and replace them with Aqua Ice.

The requisite intent and knowledge for § 533 can be established by circumstantial evidence. Shell Oil, 15 Cal. Rptr. 2d at 834. The Stipulation As to Liability Under Lanham Act and Unfair Competition Claims ("Stipulation") provides further evidence of willfulness:

- "7-Up determined that it would create, market, advertise and sell its own fruit flavored spring water." 6 Jt. App. at 2158.

- "During the term of its agreement with Geyser, and after receiving [confidential information, advertising and marketing materials for the Geyser product, pricing and consumer information], 7-Up began a process which led to the creation of 7-Up's own fruit flavored spring water, ultimately named 'Aqua Ice.' 7-Up's agreement with Geyser prohibited 7-Up from manufacturing, advertising or selling a fruit flavored water product in competition with Geyser. 7-Up determined that it would terminate its agreement with Geyser." Id. at 2158-2159.

- "Effective June 30, 1997, 7-Up terminated its Franchise Agreement with Geyser Products, Inc. Having received the [confidential information, advertising and marketing materials for the Geyser product, pricing and consumer information], 7-Up utilized a kickoff and promotion campaign similar to that it had used to introduce Geyser's Products and proceeded to market, advertise, and sell Aqua Ice, in similar flavors to Geyser's fruit flavored spring water, in a blue bottle with a sport top [like Geyser's], within the same distribution territory it had previously distributed Geyser's products. 7-Up began to develop its Aqua Ice products while the Franchise Agreement was still in effect with Geyser." Id. at 2159.

Geyser's interrogatory responses also demonstrate willfulness.

- "7-Up copied Geyser's unique packaging and sales techniques by creating a deceptively similar and imitative fruit flavored spring water beverage– Aqua Ice– packaged in blue colored plastic bottle with a sport cap, in the same or very similar flavors which 7-Up attempted to pass off as Geyser's products in the same market in which 7-Up previously sold Geyser products, and in which Geyser had created a niche." 6 Jt. App. at 2189.

- "During American's policy period 7-Up commenced development of its Aqua Ice product and took action to injure Geyser by stopping its distribution of Geyser products . . . ." Id. at 2190.

- "Geyser learned that 7-Up had contacted Geyser's beverage flavoring corporation, Universal Flavors, to obtain a match on the Geyser product line to enable 7-Up to make its own imitative flavored spring waters . . . [7-Up employee] Endow denied the improper contact had occurred and falsely

- 15 -

avowed that 7-Up did not intend to make its own flavored spring water." Id. at 2192.

In this case, the circumstantial evidence is sufficient to infer knowledge and intent on the part of 7-Up.

Section 533 is subject to the rules of statutory, not contract interpretation. E.g. Martocchio, 15 Cal. Rptr. 2d at 280. We must, therefore, construe § 533 to give effect to its purpose. Id. Its purpose is to "discourage willful torts." See e.g., Downey, 78 Cal. Rptr. 2d at 154 (citing Tomerlin v. Canadian Indemnity Co., 394 P.2d 571, 577-78 (Cal. 1964)); J.C. Penney Cas. Ins. Co., 804 P.2d at 694. What 7-Up did was willful, and § 533 bars insurance coverage here. As such, 7-Up could not have had any reasonable expectation of coverage for its actions at the time of contract. In order for a contract to be ambiguous or illusory, it must be subject to one or more objectively reasonable interpretations. Mez Indust., 90 Cal. Rptr. 2d at 729-30. The insurance policy language here, therefore, is unambiguous and not illusory.

Geyser bears the burden of proving that 7-Up's actions fall within the policy's definition of occurrence. Waller, 900 P.2d at 626. Specifically, Geyser must establish that its injury was caused by an (1) accident that (2) unexpectedly and unintentionally caused injury. For the reasons stated above, Geyser has failed to meet that burden.

AFFIRMED. The motion to certify is denied. The motion of Appellants'

counsel to withdraw is granted.

                                        Entered for the Court


                                        Paul J. Kelly, Jr.
                                        Circuit Judge