No. 123,684

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

NANCY GRANADOS, Individually, as Heir-at-Law of Francisco Granados, Decedent, and
as Class Representative of all Heirs-At-Law of Francisco Granados, Decedent,
*Appellee/Cross-appellant*,

v.

JOHN WILSON,
*Defendant*,

and

KEY INSURANCE COMPANY,
*Appellant/Cross-appellee*.

SYLLABUS BY THE COURT

1.

Kansas law is clear that for an insurer to be liable for a judgment in excess of the policy limit, there must be a causal connection between the insurer's conduct and the excess judgment.

2.

Although an insurer must exercise diligence and good faith in its efforts to settle a claim within the policy limits, an insurer owes no affirmative duty to initiate settlement negotiations with a third party before the third party makes a claim for damages.

Appeal from Wyandotte District Court; BILL KLAPPER, judge. Opinion filed February 18, 2022. Reversed and remanded with directions.

1

*James P. Maloney* and *Kevin D. Brooks*, of Foland, Wickens, Roper, Hofer & Crawford, P.C., of Kansas City, Missouri, and *James D. Oliver*, of Foulston Siefkin LLP, of Overland Park, for appellant/cross-appellee.

*Michael W. Blanton*, of Gerash Steiner P.C., of Evergreen, Colorado, and *Jared A. Rose*, of The Law Office of Jared A. Rose, of Kansas City, Missouri, for appellee/cross-appellant.

Before MALONE, P.J., POWELL and ISHERWOOD, JJ.

MALONE, J.:  This appeal arises from the district court's award of a garnishment order for Nancy Granados against Key Insurance Company (Key). John Wilson, who was insured by Key, ran a red light and killed Nancy's husband, Francisco Granados, when his car crashed into Francisco's car. Wilson was under the influence of drugs and alcohol at the time of the crash. Wilson had an automobile liability insurance policy issued by Key with a coverage limit of $25,000 per person and $50,000 per accident.

Nancy filed a wrongful death lawsuit and the district court found Wilson liable, entering judgment in excess of $3 million. Nancy then filed a garnishment action against Key based on Key's bad faith or negligence in handling the claim. The district court entered judgment for Nancy, finding Key failed to properly investigate the accident and breached its duty to communicate the risk of an excess judgment to Wilson. Key appeals, arguing the district court erred in finding it breached its duty to communicate and in finding Key caused the excess judgment. Nancy cross-appeals, arguing the district court erred in finding Key had no affirmative duty to initiate settlement negotiations.

On the record presented here, we hold the district court did not err in finding Key owed no affirmative duty to initiate settlement negotiations with Nancy before she made a claim for damages. We also hold Key's purported negligence or bad faith in handling the claim was not the legal cause of the excess judgment, and the district court erred in

2

finding otherwise. Thus, we reverse the district court's judgment for Nancy in the garnishment action and remand with directions to enter judgment for Key.

FACTUAL AND PROCEDURAL BACKGROUND

On October 4, 2017, Francisco Granados was driving his car in Kansas City, Kansas, when Wilson failed to stop at a red light and hit Francisco's car. Francisco died as a result of the collision. Raymond Elkins, a passenger in Wilson's car, told police that Wilson was taking him home and that he and Wilson each drank a half pint of brandy and had smoked a blunt before leaving.

The next day, Wilson called Key, his insurer, and spoke to Alexandra Soto, a claims adjuster. Wilson told Soto about the accident, stating he did not have a police report but that the police said he ran a stop sign. Wilson said he did not run a stop sign and maintained that he had a green light and the other person hit him. Wilson told Soto that the other person had been ejected from the car and died. Wilson also told Soto that Elkins was in the car with him, and he gave her Elkins' address and phone number.

On October 10, 2017, Soto requested the police report. Soto also left a message with a detective the day she requested the police report asking for more information. Soto then did nothing on the claim for the rest of October.

Key received the police report on November 7, 2017. The police report included no insurance information for Wilson. The police report stated that Wilson was driving under the influence of drugs and alcohol and that he ran a red light and struck the Granados' car. The police report also listed the Granados' insurance carrier, State Farm Mutual Automobile Insurance Company (State Farm), its policy number, and 12 witnesses to the crash. Soto did not enter the information from the police report into

3

Key's claim system until November 22, 2017. On December 19, 2017, Soto finished the liability evaluation and noted that Wilson was at fault.

Nancy received a letter from State Farm, dated December 26, 2017, sent to Francisco's estate asking for any medical claims to be listed on the form. Nancy threw away the form because Francisco had died at the scene, so she believed that there were no medical bills to claim. The letter mentioned nothing about Wilson being insured, or that he was insured by Key.

Nancy hired an attorney on February 28, 2018. Nancy agreed to pay her counsel 33 1/3 percent of all sums recovered unless the case settled for $50,000 or less before suit was filed, in which case all fees would be waived. The agreement also stated that all costs and expenses associated with preparing, investigating, and prosecuting the claims would be deducted from any recovery "whether by suit, settlement, or otherwise" before the calculation of attorney fees.

On March 6, 2018, Soto received a call from an employee at State Farm, which was the first time she ever spoke to the Granados' insurance carrier. State Farm told Soto that State Farm insured Francisco, that it had no information related to an attorney being involved, that it had made no payment under its policy, and that State Farm had sent letters to Nancy, but she had not responded. On April 9, 2018, Soto set a loss reserve of $25,000, the policy limit, because she knew the damages were higher than the limit.

In a letter dated June 4, 2018, Nancy's counsel notified State Farm that he was representing her. Sometime after June 9, 2018, Nancy opened a letter from State Farm, dated May 31, 2018, stating Nancy had "a liability claim against Key Insurance and an underinsured claim against this policy.'" Nancy testified this was the first time she heard of Key. But the letter did not mention Wilson or provide any contact information for Key. Nancy eventually settled her underinsured motorist claim against State Farm for $25,000.

*Wrongful death action*

On June 12, 2018, Nancy filed a petition for wrongful death against Wilson, seeking "damages in excess of $75,000." Nancy had made no claim or settlement demand on Wilson before filing the lawsuit. On June 19, 2018, a special process server left a copy of the petition at Wilson's residence. On July 2, 2018, Key received a copy of the petition. On July 23, 2018, an attorney representing Wilson answered the petition. On the same day, Key offered to settle the lawsuit for the policy limit of $25,000.

On July 26, 2018, Nancy's counsel sent a letter to Wilson's attorney, rejecting Key's offer of $25,000 to settle the wrongful death lawsuit. The letter explained that Key should have offered the policy limit "a long time ago" and stated that it had a duty to promptly initiate settlement regardless of Nancy's actions. The letter also stated that an insurance company cannot cure negligence or bad faith by offering the policy limit after suit has been filed. The letter lacked any counteroffer to settle. But on October 2, 2018, Nancy's counsel sent a letter to Wilson's attorney, seeking $2,973,434 to settle the wrongful death claim. The letter stated: "By resolving the case now, the insurance company would also avoid the consequential damages available in a bad faith lawsuit." In May 2019, Key paid out the policy limit of $25,000 to Nancy in exchange for a covenant not to execute against Wilson personally for any judgment.

Nancy moved for summary judgment on the issue of liability, but the district court denied the motion. The case proceeded to a bench trial in September 2019. Both parties were represented by counsel and evidence was offered on the issues of liability and damages. The district court ruled from the bench on October 4, 2019, finding Wilson solely liable for the accident. The district court awarded $4,603,777.52 in total damages. Wilson filed an appeal challenging the damages. The parties later jointly moved to amend the judgment by reducing the noneconomic damages to avoid an appeal. The district court granted the motion, entering a total damage award of $3,353,777.52.

*Garnishment proceedings*

On December 28, 2019, Nancy filed a request for garnishment against Key, the basis for this appeal. Key moved for summary judgment, asserting that it could not be held liable for any amount beyond the policy limit. Nancy also moved for summary judgment, asserting she may stand in the place of Wilson, the insured, and take what he could enforce from Key based on Key breaching various duties owed to Wilson. The district court denied both motions.

The district court held a two-day bench trial beginning November 24, 2020. Nancy called Leonard Gragson, claims handling manager for Key, as her first witness. Gragson testified in detail about Key's policies in handling accident claims. After outlining these policies, Gragson testified that the handling of this claim did not comply with Key's claim handling standards. Gragson summarized that Soto did not call everyone involved in the wreck after Wilson provided notice, did not call witnesses on the police report, did not contact her supervisor, did not inspect the Granados' car, did not contact the Granados' insurance provider, did not complete the investigation within 30 days, and did not complete an evaluation of liability and damages. Gragson also testified that Soto failed to contact Wilson and notify him of the risks he was facing as a result of the claim.

Soto testified next. She admitted that she did not speak to Elkins the day of the crash, or after, despite learning that he gave a statement to police at the time of the crash. Soto admitted that she did not look for any news stories to learn the identities of those involved in the crash. Soto admitted that she never contacted any of the witnesses listed in the police report. Soto also admitted that generally in a fatality case, if she received a police report revealing the insured was liable, it would be important to contact the insured, but she did not contact Wilson after receiving the report.

6

Nancy then called Charles Miller, who testified as an expert on matters related to the insurance industry. Miller testified that he reviewed the claims file, the documents produced in the underlying wrongful death action, various exhibits, and the depositions of Soto, Gragson, and Nancy. Miller also considered industry standards, Key's standards, and other companies' standards in forming his opinion. Miller acknowledged there was not one single source for insurance claim handling standards.

Miller testified that one standard repeated throughout the industry is the requirement to obtain statements from the insured, the claimants, and any witnesses at the earliest possible moment. Another standard is to have prompt investigation, leading to the fair resolution of claims as soon as possible. Similarly, in fatality cases, it is a standard to learn the measure of damages, such as whether the person was a wage earner, so that the claim can be properly evaluated. Another recognized standard practice is to affirmatively engage in settlement even when there is not a settlement demand. Miller concluded Key had failed to treat the interest of its insured equally to its own interest by failing to protect its insured from the risk of excess judgment, in violation of industry standard. Miller pointed to Key's failure to conduct a thorough and timely investigation, failure to communicate with its insured, and failure to engage in settlement discussions.

Nancy testified next. She stated that she received the police report, but it lacked Wilson's insurance information, so she assumed Wilson did not have any insurance. Nancy testified that neither State Farm nor any other insurance company informed her that Wilson was insured by Key before she sued. Nancy first learned that Key existed when it was mentioned in the letter from State Farm dated May 31, 2018, but the letter did not mention Wilson and it did not provide any contact information for Key.

Nancy testified that if she had been contacted either before she hired her attorney or before she sued, she would have settled her claims for the policy limit because then she would not have had to pay a lawyer and go through the trial. Nancy said she met with

7

attorneys after the accident because she had not been contacted by Wilson's insurance and she did not know about State Farm's uninsured motorist insurance. When asked, Nancy agreed that the second paragraph of the December letter from State Farm asked about loss of monthly earnings and funeral expenses and the last paragraph asked her to advise if she intended to present a claim for injury to the negligent party.

Nancy did not call Wilson as a witness. After she rested, Key moved for a directed verdict arguing that it did not owe any duty until the time Nancy filed the lawsuit as no claim had been made before then and because Nancy did not show that the alleged breaches caused the excess judgment. The district court denied Key's motion, finding that Nancy had established a prima facie case of bad faith and that she showed causation.

Key called Soto and Gragson who testified to much the same information elicited in Nancy's case-in-chief. Gragson testified that once Key had the police report, it had enough information to conclude that Wilson was liable and did not need any more information to conclude that a wrongful death claim would exceed the $25,000 policy limit. Gragson testified that Key paid Elkins the $25,000 policy limit after he issued a demand. Gragson testified that as of June 15, 2018, Key had received no indication that Nancy was asserting a claim. After Nancy sued, Gragson authorized Key's counsel to offer a $25,000 settlement. Gragson also testified that the file contained no notation that the decision not to solicit a claim from Nancy was a conscious strategy. Gragson testified that they did not purposely avoid contacting Nancy or Wilson in this case.

Soto similarly testified that the first time Key knew that Nancy was asserting damages against them was when they received her wrongful death lawsuit. Soto testified that she could not remember another case in which it took eight months for Key to receive notice that an injured party was pursuing a claim. Soto also testified that she had never seen a claim in which the first notice Key had that the injured person was pursuing a claim occurred when the injured party sued.

8

Key then called Doug Richmond, a licensed lawyer in Kansas and Missouri and a licensed insurance agent in Kansas, as an expert witness. Richmond stated there is no group or organization in the insurance industry that sets standards. Richmond testified that he was familiar with industry standards for claim handling based on his work with adjusters over the years and reading and writing material for the industry.

Richmond testified that Key's claim handling practices complied with the insurance industry custom, practices, and standards. Richmond also believed Key's investigation was adequate and consistent with custom and practice. Richmond concluded that Key offered to settle with Nancy "on a timely basis" and he did not believe Key had a reasonable chance to settle before that because the first time she ever asserted a claim was in her lawsuit. Richmond also concluded that Key should not have made a settlement offer to Nancy until she made a claim because it could have exposed Wilson to the potential for personal liability if Nancy rejected the offer.

After hearing the evidence, the district court ruled from the bench. The district court's comments about the case were somewhat meandering, and the court did not delineate explicit findings of fact and conclusions of law. But the court found that Gragson was a credible witness and that his testimony about how claims should be handled represented the standards in the industry. The district court found Soto "was much less forthcoming about how she handled things." The court found that Nancy was "a pretty unsophisticated consumer of insurance" but stated it believed her testimony that she would have settled for the policy limit had it been offered before the lawsuit. The court did not give the testimony of either expert much weight, stating, "this isn't a case where the court really needed experts to be honest with you."

The district court found that Soto did not comply with Key's standards for conducting her investigation. More specifically, the court said: "The court by no stretch of the imagination believes that Ms. Soto complied with the standards that Key had as far

9

as how she conducted her investigation or the timeliness of her investigation." But the court also recognized that "many of the things that she needed to know were answered by the Police report." The court found that Key did not protect Wilson's rights because it did not even consult him. The court found "that Key Insurance breached the duty that it had to Mr. Wilson by failing to communicate and advise him of what would happen if the claim of Mrs. Granados or the lawsuit of Mrs. Granados exceeded $25,000."

The district court also found that Key had no affirmative duty to reach out to Nancy and initiate a settlement offer before she made a claim, even if directed by Wilson to do so, observing that "Key wouldn't have had to do that." Finally, the district court found that it did not have to decide, and it was not going to decide, whether the letters from Nancy's counsel mentioning a bad-faith lawsuit was proper legal practice. Based only on these findings, and without engaging in any further analysis of the facts or the law, the district court granted judgment for Nancy against Key for the full amount of the excess judgment with interest at the statutory rate.

On December 3, 2020, the district court filed a journal entry of judgment referencing its findings from the bench. Key timely appealed the district court's judgment and Nancy has cross-appealed, arguing the district court erred in finding Key had no affirmative duty to initiate settlement negotiations.

ANALYSIS

To begin, Nancy argues that Key failed to preserve its issues for appeal because it violated Supreme Court Rule 6.02(a)(5) (2021 Kan. S. Ct. R. at 36), which requires that the appellant provide "a pinpoint reference to the location in the record on appeal where the issue was raised and ruled on." Nancy does not assert that Key did not raise its issues below but simply asserts that Key failed to follow the pinpoint citation requirement. Key

10

replies that it did make the required pinpoint references on pages 11-12, 24, and 30-31 of its appellant's brief.

Key's citation to pages 11 and 12 of its appellant's brief does not fulfill the requirements of Rule 6.02 as those pages are part of the statement of facts. Pages 11 and 12 lack any reference to the arguments Key made in district court. But Key correctly asserts that, on page 24 of its brief, it pointed out that it argued these issues below and provided citations to those arguments. While Key buried this citation in the middle of its analysis, and the better practice would be to place this citation at the beginning of the legal issue, the issues raised in this appeal were raised and ruled on below. See Rule 6.02(a)(5) (2021 Kan. S. Ct. R. at 36) ("Each issue must *begin with* citation to the appropriate standard of appellate review and a pinpoint reference to the location in the record on appeal where the issue was raised and ruled on."). (Emphasis added.)

Before addressing the parties' arguments, we will examine the relevant law on bad-faith claims against insurance companies, as doing so will help distinguish this case from most cases involving an insurer being liable for an excess judgment.

*Relevant law on garnishments and bad-faith claims*

This appeal arises from a garnishment action. "'Garnishment is a procedure whereby the wages, money or intangible property of a person can be seized or attached pursuant to an order of garnishment issued by the court under the conditions set forth in the order.'" *Geer v. Eby*, 309 Kan. 182, 191, 432 P.3d 1001 (2019) (quoting K.S.A. 60-729[a]). In a garnishment action, the creditor stands in the shoes of the debtor to enforce what the debtor could enforce. Nancy stands in the shoes of Wilson and can enforce an action against Key to the extent that Wilson could enforce such an action. Nancy sought to enforce a garnishment against Key based on Key's liability for the excess judgment because it acted in bad faith or negligently by failing to properly investigate, failing to

11

settle once it knew liability would exceed the policy limit, failing to consider the risks of excess judgment, and failing to communicate those risks with Wilson.

Insurance companies generally owe their insured certain duties, including the duty to defend a claim, the duty to investigate, and the duty to settle claims. The Kansas Supreme Court has long recognized that an insurance company can be liable for more than the policy limit if it fails to act in good faith or fails to act without negligence in defending and settling claims against its insured. *Glenn v. Fleming*, 247 Kan. 296, 305, 799 P.2d 79 (1990); *Bollinger v. Nuss*, 202 Kan. 326, Syl. ¶ 1, 449 P.2d 502 (1969). The seminal case for this rule is *Bollinger*.

Karl Nuss hit Walter Bollinger, a pedestrian, with his car and Bollinger sustained injuries requiring hospitalization and care amounting to just under $3,000. Nuss' insurance policy limit was $25,000. Bollinger sued less than a year later seeking $85,000. Counsel for Nuss' insurance company was Tudor Hampton. An associate of Hampton informed Nuss of the suit and that the insurance company would only pay the policy limit and he would be liable for the excess. Nuss told Hampton to settle. During discovery, Hampton made two settlement offers, with Nuss' knowledge, of $7,500 and $10,000 before trial. Bollinger offered to settle for $23,500 but Hampton and Nuss thought that Bollinger would not recover that much at trial. After Bollinger presented his evidence, Hampton told Nuss that there was no evidence supporting a contributory negligence defense and advised that they should admit liability and ask for mercy on the amount of judgment. Nuss agreed with this strategy. Hampton did not challenge Bollinger's medical evidence. The jury returned a verdict for Bollinger in the sum of $30,483.84.

Bollinger filed for garnishment against the insurer for the full amount of the judgment on a theory of fraud, bad faith, or negligence in handling the claim. The district court found no evidence to support any of the theories and Bollinger appealed. Our Supreme Court explained that the area of an insurer's liability for excess judgments "has

been fraught with uncertainty since its inception." 202 Kan. at 331. The court noted there were two prominent theories for imposing liability:  a "negligence theory" and a "good faith theory." 202 Kan. at 331. The court noted the first time it had cited both theories was in *Bennett v. Conrady*, 180 Kan. 485, 305 P.2d 823 (1957), in which it examined whether an insurer was negligent or acted in bad faith for failing to settle all the claims against its insured. The *Bollinger* court observed that in *Conrady*, it "noted that once the insurer steps into the negotiations between its insured and an injured claimant, due care must be exercised by the insurer to protect the rights of the insured." 202 Kan. at 332.

The court noted that its application of both tests in *Bennett* led to confusion about which test governed in Kansas, but it found that in Kansas liability may be imposed under either theory because an insurer owes both a duty of good faith and a duty to act without negligence. *Bollinger*, 202 Kan. at 333. The court then discussed when the duty to act in good faith or without negligence is breached regarding settlement. The court explained:

"When a claim is made against the insured for an amount in excess of the policy coverage, the insurer's obligation to defend creates a conflict of interest on its part. On the one hand, its interests lie in minimizing the amount to be paid; on the other, the insured's interests, which the insurer is supposedly defending, lie in keeping recovery within policy limits, so that he will suffer no personal financial loss. The conflict becomes particularly acute where there is an offer of settlement approximating policy limits. The insured's desire to avoid the risk of a large judgment by settling within the limits of the policy, regardless of the merits of the claim, would compel him, were he in charge of settlement negotiations, to accept the offer. The insurer's interests, on the other hand, are prompted by its own evaluation of the liability aspects of the litigation and a desire not to expose itself to payments which do not adequately reflect the dangers that might be involved in pursuing the case to trial. When the settlement offer approaches policy limits, the insurer has a great deal less to risk from going to trial than does the insured, because the extent of its potential liability is fixed." 202 Kan. at 336.

13

Based on this conflict, the court held that the insurer "may properly give consideration to its own interests, but it must also give at least equal consideration to the interests of the insured." 202 Kan. at 336. The court then cited the "equality of consideration" factors—often called the *Bollinger* factors—to be used in deciding whether an insurer's refusal to settle constituted a breach of its duty to exercise good faith or act without negligence:

> "'(1) the strength of the injured claimant's case on the issues of liability and damages; (2) attempts by the insurer to induce the insured to contribute to a settlement; (3) failure of the insurer to properly investigate the circumstances so as to ascertain the evidence against the insured; (4) the insurer's rejection of advice of its own attorney or agent; (5) failure of the insurer to inform the insured of a compromise offer; (6) the amount of financial risk to which each party is exposed in the event of a refusal to settle; (7) the fault of the insured in inducing the insurer's rejection of the compromise offer by misleading it as to the facts; and (8) any other factors tending to establish or negate bad faith on the part of the insurer.'" *Bollinger*, 202 Kan. at 338 (quoting *Brown v. Guarantee Ins. Co.*, 155 Cal. App. 2d 679, 689, 319 P.2d 69 [1957]).

After deciding the law, the court then applied it to the facts of the case. The court noted that several factors did not apply under the facts and that Nuss' argument only centered on three of the factors: the failure of the company to inform him about "certain matters," the company's failure to settle once it knew that he was liable, and the company's rejection of Bollinger's offer. 202 Kan. at 339. The court noted: "A duty is imposed on the company to communicate to the insured the results of any investigation indicating liability in excess of policy limits and any offers of settlement which have been made, so that he may take proper steps to protect his own interests," but found that the record showed the company made an adequate investigation and fully informed Nuss of the results and risks. 202 Kan. at 339 (citing *Davy v. Public National Ins. Co.*, 181 Cal. App. 2d 387, 5 Cal. Rptr. 488 [1960] for the rule).

14

As for settlement, the court found that the amount of financial risk to which each party is exposed is a relevant factor in determining whether the insurance company is liable for the excess judgment, but that the strength of the plaintiff's case must be gauged as it appeared at the time of the offer, not through hindsight. 202 Kan. at 340. The court noted that at the time of the offer, both Nuss and Hampton believed that Bollinger would not recover $23,500 if they proceeded to trial despite knowing Nuss was liable for the accident. The court pointed out that after its investigation, the insurance company believed a $10,000 settlement was appropriate. The court found that at most the case established "an error of judgment" on the part of Nuss and the insurance company and it did not warrant a conclusion that the insurer acted in bad faith or negligently. 202 Kan. at 342. Thus, the court affirmed the district court's refusal to hold the insurance company liable for the excess judgment. 202 Kan. at 343.

*Bollinger*'s progeny later recognized that because the duty of good faith arises from the contract, there must be a causal connection between the insurer's conduct and the excess judgment. *Gruber v. Estate of Marshall*, 59 Kan. App. 2d 297, 315, 482 P.3d 612, *rev. denied* 313 Kan. 1040 (2021). An insurer is not liable for a judgment entered against its insured unless the plaintiff can show the excess judgment is traceable to the insurer's conduct. 59 Kan. App. 2d at 315. Courts have held that an insurer is not the legal cause of an excess judgment when the claimant rejects a policy-limits settlement offer that he or she would have accepted earlier, solely to manufacture a bad-faith claim. 59 Kan. App. 2d at 315. "The plaintiff should be able to show why an offer that would have been good one day is not acceptable a short time later." 59 Kan. App. 2d at 316.

With this general framework in mind, it is important to note this case is different from typical bad-faith or negligence claims against an insurer in that Nancy never made any demand for damages before filing her lawsuit, yet her entire bad-faith claim stems from Key's conduct before Nancy sued. Similarly, Key never refused to settle for policy limits, believing it could do better at trial. As we will explain in this opinion, this narrow

15

focus on Key's actions before Nancy made any demand for damages distinguishes her case from other cases on the liability of an insurer for excess judgment.

In granting judgment against Key, the district court did not address each of the *Bollinger* factors in deciding whether Key's actions breached its duty to exercise good faith or act without negligence. The district court did find that Soto violated Key's own standards and insurance industry standards in conducting her investigation of the accident. This finding is supported by substantial competent evidence. But the district court also recognized that much of the information Soto needed to know was in the police report that she requested and received about one month after the accident.

The district court appeared to base its judgment mostly on its finding "that Key Insurance breached the duty that it had to Mr. Wilson by failing to communicate and advise him of what would happen if the claim of Mrs. Granados or the lawsuit of Mrs. Granados exceeded $25,000." But the district court never explained how Key's failure to communicate the risks to Wilson caused the excess judgment. As Key points out, Wilson did not testify at the hearing and there is no evidence in the record showing what he would have done to change the result of the case or to prevent the excess judgment had he known the risks: would he have hired an attorney, would he have tried to settle outside his insurance company, would he have reached out to Nancy personally.

Key challenges the district court's finding that Key breached its duty to communicate with Wilson, arguing that it owed no duty to communicate the risks of an excess judgment to Wilson until Nancy made a claim. For the purpose of deciding this appeal, we will accept that Key violated its own standards and industry standards in investigating the accident. We will also assume that Key owed a duty to communicate the risk of an excess judgment to Wilson even before Nancy made a claim, and that Key breached this duty. The lack of communication between Key and Wilson would amount to only one of the factors the district court should have considered in deciding whether

16

Key breached its duty to exercise good faith or act without negligence. See *Bollinger*, 202 Kan. at 338. More importantly, there must also be a causal connection between Key's breach of duty to Wilson and the excess judgment. *Gruber*, 59 Kan. App. 2d at 315.

Key's main argument on appeal is that the district court erred by entering judgment for Nancy against Key in excess of the policy limit based on Key's failure to communicate with Wilson because any lack of communication was not the cause of the excess judgment. We will address this issue first.

DID THE DISTRICT COURT ERR IN DETERMINING THAT KEY'S INADEQUATE COMMUNICATION WITH WILSON CAUSED THE EXCESS JUDGMENT?

As we have stated, Kansas law is clear that because the duty of good faith arises from the contract, there must be a causal connection between the insurer's conduct and the excess judgment. *Gruber*, 59 Kan. App. 2d at 315. Key argues that the district court erred in entering judgment for Nancy because (1) there is no evidence of causation beyond the fact that Nancy rejected Key's policy-limit offer to pursue a bad-faith claim against Key, and (2) there is no evidence that communication with Wilson would have prevented the excess judgment. In response, Nancy asserts that Key's argument about causation is contrary to both the law and the facts of her case.

An appellate court applies a bifurcated standard of review to garnishment orders. *Geer*, 309 Kan. at 190. Under a bifurcated standard,

> "'[t]he function of an appellate court is to determine whether the trial court's findings of fact are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. Substantial evidence is such legal and relevant evidence as a reasonable person might accept as sufficient to support a conclusion. An appellate court's review of conclusions of law is unlimited. The appellate

17

court does not weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact. [Citations omitted.]'" 309 Kan. at 190-91.

The district court found Nancy's assertion that "she would have settled this case for $25,000" credible. The court then stated the causal connection for Nancy's action was the lack of communication with Wilson. More specifically, the court found "that Key Insurance breached the duty that it had to Mr. Wilson by failing to communicate and advise him of what would happen if the claim of Mrs. Granados or the lawsuit of Mrs. Granados exceeded $25,000." The court stated Key "had to at least consult with him. They had at least to advise him that look [Key was] going to cover this first $25,000 and after that it [was] all on [him]." But the court later stated that if Wilson had reached out to Key and told them to settle, Key would not have had to do that, but the communication would have "fulfilled their duty to have communicated with him and to have told him what would have happened if Mrs. Granados doesn't accept the $25,000." Finally, the district court found that it did not have to decide, and was not going to decide, whether the letters from Nancy's counsel mentioning a bad-faith lawsuit was proper legal practice.

Key argues that the district court incorrectly declined to consider evidence—the letters from Nancy's counsel—that showed Nancy impermissibly rejected a policy-limit offer simply to manufacture this bad-faith claim, which is part of a causation analysis. Key argues that an insurer's actions cannot be the cause of an excess judgment when the rejection of a policy-limit settlement was because of the claimant's desire to pursue a bad-faith claim. Key asserts that Nancy's own testimony established that she was willing to accept a policy-limit settlement on June 11, 2018—the day before she filed her lawsuit— but she then rejected Key's policy-limit offer which it extended on July 23, 2018. Key asserts that the only evidence explaining the reason for rejection of the policy-limit offer was the letter from Nancy's counsel rejecting the offer because they believed Key had acted in bad faith or negligently. Key asserts that the fee agreement, the reference to a

18

bad-faith claim in rejecting the settlement offer, and the drastic increase in the amount acceptable for settlement also prove Nancy rejected the offer to pursue a bad-faith claim.

Nancy argues that Key's argument fails to recognize the proposition of law that an insurer cannot offer the policy limit after a lawsuit was filed to cure previous negligence or bad faith. Nancy asserts that the reliance on statements in her counsel's letters is improper because the statements represent her attorney's reasons for rejecting settlement rather than Nancy's own personal reasons for not settling. Nancy asserts that her reason for rejecting the offer was because she incurred legal fees when she sued. Nancy argues that Key's argument also focuses on the time frame after suit instead of the time frame before suit in which Key "repeated[ly] fail[ed]" to follow its own policies on settlement.

Key replies that Nancy's arguments establish that her decision to hire an attorney was the determinative factor in whether she would settle for the policy limit. Key asserts that Nancy arbitrarily created a deadline for settlement that was not based on a statute of limitations or cost expenditure but was based on her agreement with counsel that incentivized pursuing a bad-faith claim. Key also points out that Nancy's argument relies on Key failing to solicit a claim or contact her, but the district court found that it owed no duty to settle with her.

*Caselaw addressing the manufacture of a bad-faith claim*

Key is correct that Kansas courts have recognized that an insurer is not the legal cause of an excess judgment if the claimant rejects a settlement offer that he or she would have accepted earlier solely to manufacture a bad-faith claim. See *Gruber*, 59 Kan. App. 2d at 315-16. We have found a half-dozen cases in federal and state court addressing the manufacture of a bad-faith claim. Four have found that the insurer was not the legal cause of the excess judgment because the plaintiff manufactured the bad-faith claim, while two have found the claimant did not manufacture a bad-faith claim.

19

The case with the most thorough discussion on manufacturing a bad-faith claim is *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657 (10th Cir. 2007), where the Tenth Circuit found that an insurer was not the legal cause of the excess judgment because the claimant manufactured a bad-faith claim. In *Wade*, the claimant demanded a policy-limit settlement soon after an accident in which both liability and the extent of injuries were contested. In the settlement offer, claimant's counsel stated that he had ordered claimant's medical records and would forward them to the insurer upon receipt. Two weeks later, claimant's counsel sent part of the medical records to the insurer and stated that claimant would withdraw the policy-limit settlement offer in a month. When the offer expired, the insurer was still unable to determine liability as key witnesses were not responding and it still had not received all the medical records. In fact, claimant's counsel did not receive the rest of the medical records until two weeks after the settlement offer expired and he did not send those records to the insurer.

A few days later, claimant's counsel again offered to settle for the policy limit. Less than three weeks later, on August 20, and before the insurer examined the rest of the medical records, claimant sent a letter withdrawing the settlement offer, enclosed a copy of a petition, and stated that claimant would delay filing the petition to give the insurer time to make a settlement offer should it desire to do so. It took another two months for the insurer to obtain the missing medical records independent of claimant. After review, on November 1, it authorized a policy-limit settlement offer.

Two weeks later, claimant's counsel rejected the policy-limit offer in a letter stating claimant could not accept the policy limit because the facts of the case established a "'prima facie case'" of negligence or lack of good faith because the insurer failed to accept either of claimant's policy-limit settlement offers. 483 F.3d at 664. The case went to trial and claimant procured a judgment in excess of the policy limits. Claimant then sought to collect from the insurer based on a claim of negligence or bad faith. The district

court granted summary judgment for the insurer finding it did not act negligently or in bad faith in waiting to settle until it had more information.

On appeal, the Tenth Circuit explained that courts should be cautious to avoid creating an incentive for claimants to manufacture bad-faith claims:

> "[T]he doctrinal impetus for insurance bad faith claims derives from the idea that the insured must be treated fairly and his legitimate interests protected . . . . In other words, the justification for bad faith jurisprudence is as a shield for insureds—not as a sword for claimants. Courts should not permit bad faith in the insurance milieu to become a game of cat-and-mouse between claimants and insurer, letting claimants induce damages that they then seek to recover, whilst relegating the insured to the sidelines as if only a mildly curious spectator." 483 F.3d at 669-70.

The court then applied the law to the facts and found that the insurer did not act in bad faith when it refused to settle for the first two offers because the claimant set an arbitrary deadline and failed to provide necessary information. 483 F.3d at 670-71. The court explained that the "undisputed evidence" showed that claimant's sole reason for rejecting the offer was to pursue a bad-faith claim, as evidenced by claimant's counsel's letter stating as much and his deposition. 483 F.3d at 673. The court pointed out that no new information emerged between August 20 and November 1 that would have showed the circumstances had changed, and claimant could not provide "any other legitimate reason why the policy-limits offer, which was good on August 20, was no longer good on November 1." 483 F.3d at 673. The court found when a claimant arbitrarily withdraws a settlement offer and later rejects an identical one, the claimant's conduct, not the insurer's, is the legal cause of the failure to settle. 483 F.3d at 674. The court held:

> "The cause of action for failure to settle is meant to protect the interests of the insured by requiring the insurer to conduct the litigation, including settlement negotiations, as if the insurance contract had no policy limits. It is not meant to create an artificial incentive for

21

third-party claimants to reject otherwise reasonable settlement offers that are within the policy limits. We would be turning the cause of action on its head by holding an insurance company liable where it eventually offered to settle the claim for the policy limits, but a claimant rejected the offer precisely in order to manufacture a lawsuit against the insurer for bad-faith refusal to settle. [Citation omitted.]" 483 F.3d at 674.

*Wade* is an example of a case when the court held that the claimant's own conduct manufactured a bad-faith claim. Before discussing the next case, we recognize that *Wade* is distinguishable because our case does not involve an insurer trying to get medical records to establish the damages involved in the case. Still, *Wade* is relevant to our case for other reasons, including its discussion of the claimant's arbitrary settlement deadline, the claimant's reference to pursing a bad-faith claim when rejecting the insurer's policy-limit settlement offer, and the claimant's failure to explain why a policy-limit settlement offer that was good one day was not acceptable a short time later.

Next, in *Wiebe v. Hicks*, No. 98,990, 2008 WL 4291641, at *7 (Kan. App. 2008) (unpublished opinion), a panel of this court upheld a district court's decision that the insurer did not act in bad faith or negligently in failing to settle a claim. Hicks rear-ended Wiebe at a stoplight, and Hicks immediately notified his insurer of the accident. A few months later, Wiebe sent a demand letter for $250,000 or, in the alternative, a settlement for the policy limit subject to certain conditions. The letter explained Wiebe planned to consult with a surgeon, but he was "'hesitant'" to have surgery. 2008 WL 4291641, at *1. Hicks' insurer responded the policy limit was $100,000, and it needed more information to evaluate the claim. Wiebe's attorney notified the insurer the settlement offer would remain open until May 31, 2003. The insurer asked for an extension until June 13, but Wiebe's attorney did not respond. On June 2, 2003, Wiebe withdrew his settlement offer and sued Hicks. Wiebe had surgery two days later.

Wiebe ultimately recovered a judgment for over $200,000. Wiebe filed a garnishment action against the insurer. The district court found the insurer did not act in

22

bad faith in failing to accept Wiebe's offer. The panel affirmed the findings, stating that Hicks' insurer was still investigating the value of the claims and did not know the nature and extent of Wiebe's injuries; Wiebe's settlement offer was "'completely arbitrary,'" as there was no statute of limitations issue; there was no evidence of trial preparation of investigation taking place between May 31 and June 13; and Wiebe offered no other evidence to establish a legitimate reason why the policy limit was acceptable on May 31 but not on June 13. 2008 WL 4291641, at *7.

Similarly, in *Blanco-Diaz v. Maus*, No. 103,916, 2012 WL 718919, at *1 (Kan. App. 2012) (unpublished opinion), a panel of this court upheld a district court's denial of a bad-faith judgment based on lack of causation. The panel explained that the facts established that 6 months after an accident, claimant sent a demand letter for $1,000,000, to the insurer with a 30-day time limit. The letter also suggested that failure to settle within the 30 days would amount to bad faith and would impose liability on the insurance company for an excess judgment. At the time of the offer, both claimant and the insurer knew that the amount of coverage was unresolved based on the potential applicability of business liability provisions. The panel concluded that the 30-day deadline in the demand letter "was arbitrary in the sense that no legal rights or duties would have been compromised if settlement were not reached within that period" and "[t]he language of the [demand] letter supports an inference the lawyer, at least in part, intended to maneuver [the insurer] into a bad-faith posture." 2012 WL 718919, at *3. The panel also noted that both parties knew that the policy limit was in dispute at the time of the offer. 2012 WL 718919, at *3.

Next, in *Kemp v. Hudgins*, 133 F. Supp. 3d 1271 (D. Kan. 2015), a federal district court found that a claimant manufactured a bad-faith claim. Kaston Hudgins, who was fleeing from police at a high rate of speed, crashed his car into the car driven by Teresa Kemp, killing Kemp and her daughter. The car Hudgins was driving was owned by his girlfriend, Ashley Kelley, and was insured through Dairyland Insurance Company

23

(Dairyland) with a $25,000/$50,000 policy limit. Dairyland knew within days of the accident that the potential claims exceeded the policy limit.

Dairyland offered to settle all potential claims for the policy limit in exchange for a release of Hudgins and Kelley. The claims were never settled because Kemp's estate did not want to release Kelley so that it could pursue a negligent entrustment action against her. Kemp's personal representative signed a contingency fee contract with an attorney which provided that the attorney would recover 40% of any funds recovered except no fee would apply to the first $50,000 collected from Dairyland. Kemp's estate filed a wrongful death action against Hudgins and did not name Kelley as a defendant. Dairyland again offered to settle the case for its policy limit. The estate responded that it would settle with Hudgins if he would consent to judgment in excess of $5 million. The case never settled, and ultimately the estate recovered a judgment against Hudgins in excess of $5 million. The estate then filed a garnishment action against Dairyland to recover the excess judgment. Dairyland moved for summary judgment asserting it did not act in bad faith during the settlement negotiations.

The Kansas district court granted summary judgment for Dairyland, finding it was not liable for the excess judgment because its conduct was not the cause of the excess judgment. 133 F. Supp. 3d at 1295. The district court found the uncontroverted evidence showed that the estate rejected each policy-limit settlement proposal after the lawsuit was filed because it did not believe the offer sufficiently covered its claim. 133 F. Supp. 3d at 1296. The court also pointed out that the fee agreement and stipulated judgment offer made clear that the estate was planning to pursue a bad-faith claim and was not interested in settling for the policy limit. 133 F. Supp. 3d at 1296. The court also pointed out that while the estate's circumstances changed in terms of litigation expenses, it would not have incurred the fees had it accepted the policy-limit offers advanced early in the case. 133 F. Supp. 3d at 1296. The court concluded from the evidence that "no reasonable jury" could find that Dairyland's conduct caused the excess judgment. 133 F. Supp. 3d at 1295.

24

In contrast, the Tenth Circuit found that a claimant did not manufacture a bad-faith lawsuit in *Roberts v. Printup*, 595 F.3d 1181 (10th Cir. 2010). Roberts was injured when the brakes failed while riding in the car with her son. She later consulted with an attorney and sent a letter to Shelter Mutual Insurance Company (Shelter) seeking to settle all her claims for the policy limit of $25,000. The demand had a 10-day time limit because the statute of limitations was due to expire. When Shelter did not accept the settlement, Roberts sued her son. Because of a mix up on Shelter's end, Roberts' settlement demand was sent to a different department and was not received by the claims department until three weeks after its original delivery. Shelter then offered to pay the policy limit. The district court found Shelter negligent in handling Roberts' claim but found that based on *Wade*, Shelter's negligence was not the legal cause of excess judgment because Shelter offered the policy limit three weeks after Roberts' deadline.

The Tenth Circuit found the district court erred in finding Roberts caused the excess judgment because there was no "semblance of impropriety on the part of Ms. Roberts" as there was in *Wade*, where the insurer acted reasonably and any delay in settlement was because of the claimant's failure to turn over information. *Roberts*, 595 F.3d at 1189. The court summarized that Roberts did not intentionally send her claim to the wrong office, the 10-day deadline was reasonable given the impending expiration of the statute of limitations, and the delay in settlement led Roberts to incur additional costs and fees and her filing a lawsuit against her son. Based on these facts, the Tenth Circuit explained that no evidence suggested that Roberts imposed an arbitrary deadline or provided insufficient information to Shelter for it to make a fair appraisal of the case. 595 F.3d at 1190. The court found that "it was Shelter's failure to implement a system to handle reasonable time-sensitive offers in negligent disregard of its insured's interest that exposed Mr. Printup to damages in excess of policy limits" and that "the facts of this case do not raise a suspicion of the 'cat-and-mouse' game between claimants and insurers cautioned against in *Wade*." *Roberts*, 595 F.3d at 1190-91. Thus, The Tenth Circuit reversed the district court and directed it to enter judgment for Roberts. 595 F.3d at 1191.

25

Finally, a panel of this court also found a claimant had not manufactured a bad-faith claim in *Gruber*—a case with unusual facts. In *Gruber*, two friends, Marshall and Gruber, died when the plane Marshall was piloting crashed in April 2013. Marshall was a retired surgeon and Gruber was a development officer for the College of Veterinary Medicine at Kansas State University. Marshall had general liability insurance coverage and the policy included "'voluntary settlement coverage,'" which allowed payment of the $100,000 policy limit upon the insured's request to a passenger's estate regardless of fault in exchange for a release of liability of the insured. The policy had a one-year expiration date, meaning that if the insured had not asked the insurer to pay the voluntary settlement within a year, the coverage expired. The Marshall estate authorized payment under the policy in September 2013, within the one-year time limit. The insurance company knew within a few months of the crash that the potential liability of Marshall's estate was higher than the policy limits and that the estate had substantial assets to protect.

In December 2014, Gruber's estate filed a wrongful death lawsuit against the Marshall estate and two aircraft repair companies. Then, in May 2015, the insurance company offered the Gruber estate the $100,000 policy limit, but the estate rejected the offer stating it had come "too late." 59 Kan. App. 2d at 308. The district court found Marshall solely at fault for the crash and awarded damages in excess of $11 million. The Gruber estate then filed a garnishment action against Marshall's insurance company. The district court found that the insurer had acted negligently or in bad faith by failing to timely offer the voluntary settlement coverage policy limit, and the district court found the insurer liable for the entire amount of the excess judgment.

On appeal, the *Gruber* panel upheld the district court's judgment. As for causation, the panel noted that the evidence showed that the Gruber estate would have accepted the policy-limit settlement offer within the first year of the crash. 59 Kan. App. 2d at 315. The panel found that the causation depended on the voluntary settlement coverage policy that was "unique to this case." 59 Kan. App. 2d at 317. The Gruber estate had not made a

26

settlement offer with an arbitrary deadline nor withheld necessary information to settle the claim. 59 Kan. App. 2d at 317. The panel found there was no evidence to show that the rejection of the settlement offer was to set up a bad-faith claim. 59 Kan. App. 2d at 317. The panel noted the insured was not of "'meager means'" and the Gruber estate could have recovered against the personal assets of the insured. 59 Kan. App. 2d at 318.

*Applying the law to our facts*

Applying the analysis in these cases to our facts, Key asserts that Nancy's own arbitrary actions were the legal cause of the excess judgment, not Key's purported bad-faith or negligent actions. The relevant facts of this case are not in dispute: (1) Key knew that Wilson was liable and that damages would exceed the $25,000 policy limit after it received the police report in November 2017; (2) Nancy received a letter from her own insurance company, State Farm, in December 2017 asking her to report any claims, but she threw the letter away; (3) Nancy hired an attorney in February 2018; (4) the fee agreement stated that she would pay counsel one-third of all sums recovered unless the case settled for $50,000 before suit was filed, in which case all fees would be waived; (5) as of March 2018, State Farm informed Key that Nancy had not responded to its letters and it had made no payment under its policy; (6) on June 4, 2018, Nancy's attorney told State Farm that he was representing her; (7) sometime after June 9, 2018, Nancy opened a letter from State Farm, dated May 31, 2018, stating she had a liability claim against Key, but the letter did not mention Wilson or provide any contact information for Key; (8) on June 12, 2018, Nancy filed her wrongful death suit; (9) Key received the petition on July 2, 2018; (10) on July 23, 2018, Key offered to settle for the policy limit; (11) on July 26, 2018, Nancy rejected the offer in a letter from her counsel stating that an insurance company cannot cure negligence or bad faith by offering the policy limit after suit has been filed; and (12) Nancy testified—and the district court found it credible—that if she had been contacted before she sued she would have settled her claim.

27

To begin, the district court's finding that Nancy would have settled for the policy limit if she had been contacted before she sued is supported by substantial competent evidence. The district court explicitly found Nancy credible, a finding that this court does not reweigh on appeal. See *Geer*, 309 Kan. at 190-91. That said, Nancy filed her lawsuit on June 12, 2018, and she rejected Key's policy-limit settlement offer on July 26, 2018. In evaluating Nancy's bad-faith claim against Key, a relevant inquiry is why a policy-limit settlement she would have accepted on June 12, 2018, was not acceptable about 6 weeks later, on July 26, 2018. Nancy contends that it was because she had to incur the added expense of filing a lawsuit. She emphasizes our court's ruling that an insurer cannot cure its previous negligence or bad faith by offering the policy limit after commencement of a lawsuit. *Gruber*, 59 Kan. App. 2d at 303.

But like *Wade*, *Wiebe*, *Blanco-Diaz*, and *Kemp*, Nancy set an arbitrary deadline—June 12 when she filed her lawsuit—for settlement. As in *Blanco-Diaz*, the deadline is arbitrary in that no legal rights or duties would have been compromised if settlement had not been reached by that date. For instance, this case is not like *Roberts* where the statute of limitations would run. Nancy sued a little more than eight months after the accident. Thus, she still had about 16 months on the statute of limitations. See K.S.A. 60-513.

The deadline imposed by Nancy is even more arbitrary than those considered in *Wade*, *Wiebe*, *Blanco-Diaz*, and *Kemp* because Nancy never revealed she was seeking damages, let alone that there was a deadline for settlement. Without communicating her "deadline" for accepting settlement, she was in total control of whether Key's actions would lead to an excess judgment. As explained in *Wade*, "[p]ermitting an injured plaintiff's chosen timetable for settlement to govern the bad-faith inquiry would promote the customary manufacturing of bad-faith claims." 483 F.3d at 670.

Nancy contends she did not know that Wilson was insured by Key when she filed her lawsuit. Coincidentally, Nancy received a letter from State Farm referencing her

28

potential claim against Key about the same time the lawsuit was filed. But even if the lawsuit hit the courthouse before Nancy had any official notice of Key, it remains relevant to the bad-faith claim that Nancy filed her lawsuit without sending any demand letter to Wilson, making a claim for Nancy's damages or asking about Wilson's possible insurance coverage. Our Supreme Court has stated that it should be "standard procedure unless an immediate filing of an action is required by imminent running of the statute of limitations or some other good reason" for an attorney "before filing an action, [to make] a demand upon his client's adversary and [extend] to him the opportunity to respond with his version of the facts." *Nelson v. Miller*, 227 Kan. 271, 285, 607 P.2d 438 (1980).

*Nelson* is distinguishable because that case involved a malicious prosecution case against attorneys for filing a medical malpractice lawsuit against a physician without conducting a proper investigation. But the fact remains that a routine demand letter from Nancy's counsel to Wilson, had counsel had any motivation to send one, could have led to a swift settlement of Nancy's claim for Key's policy limits—and Nancy would not have incurred any legal fees in this case based on her fee agreement with counsel.

Next, we consider Nancy's response to Key's policy-limit settlement offer. In a letter from Nancy's counsel dated July 26, 2018, Nancy rejected Key's offer without making any counteroffer. The letter gave no reasons why Nancy would not settle for Key's policy limits, except for referring to a potential bad-faith claim against Key for not settling "a long time ago." Then, on October 2, 2018, Nancy's counsel sent a letter to Wilson's attorney, seeking $2,973,434 to settle, asserting that settlement for that amount would allow Key to "avoid the consequential damages available in a bad faith lawsuit." As in *Blanco-Diaz* and *Wade*, this reference to a bad-faith claim is evidence supporting that the claimant rejected settlement solely to manufacture the bad-faith claim. See *Blanco-Diaz*, 2012 WL 718919, at *3 (pointing to counsel's letter as supporting an inference that lawyer intended to maneuver the insurer into a bad-faith posture); *Wade*,

483 F.3d at 673 (pointing to counsel's letter stating it would pursue a bad-faith claim as evidence of manufacturing a bad-faith claim).

In awarding judgment against Key for bad faith and negligence, the district court commented that it need not consider whether the letters from Nancy's counsel mentioning a bad-faith lawsuit was proper legal practice. But the reference in the letters to a potential bad-faith claim was evidence supporting that counsel rejected the settlement with motivation to pursue a bad-faith claim. See *Blanco-Diaz*, 2012 WL 718919, at *3; *Wade*, 483 F.3d at 673. Contrary to its assertions, the district court should have considered the letters, and other evidence about Nancy's rejection of the policy-limit settlement offer, as part of its causation analysis. The district court erred by failing to do so.

Nancy asserts that the reliance on statements in her counsel's letters is improper because the statements represent her attorney's reasons for rejecting settlement as opposed to Nancy's own personal reasons for not settling. But "[i]t has been recognized generally that a client is bound by the appearance, admissions, and actions of counsel acting on behalf of his client." *Reimer v. Davis*, 224 Kan. 225, 229, 580 P.2d 81 (1978). We presume that Nancy essentially followed her counsel's advice on what strategy she should pursue in her claim against Key. Although the decision to accept or reject a settlement offer was Nancy's, the reference in counsel's letters to a potential bad-faith claim is the type of evidence a court can consider in assessing the motivation for rejecting a settlement offer. See *Blanco-Diaz*, 2012 WL 718919, at *3; *Wade*, 483 F.3d at 673.

As a related matter, in rejecting the policy limit, Nancy's counsel asserted that "[a]n insurer cannot cure its previous negligence or bad faith by offering the policy limit after commencement of a suit." She relies on this proposition to support her assertion that the issue of manufacturing a bad-faith claim is irrelevant. See *Gruber*, 59 Kan. App. 2d at 303. But the rule in *Gruber* is taken from *Smith v. Blackwell*, 14 Kan. App. 2d 158, 791 P.2d 1343 (1989), in which the insurer had a pre-suit policy-limit demand, which it

refused to pay, and then it offered the policy limit after the claimant had sued. The panel in *Smith* explained that the insurer could not "'cure'" its previous negligent behavior because "'[A]ll the good faith and settlement offers in the world *after* suit is filed will not immunize a company from the consequences of an unjustified refusal to pay which made the suit necessary.'" 14 Kan. App. 2d at 163-64 (quoting *Sloan v. Employers Casualty Ins. Co.*, 214 Kan. 443, 444, 521 P.2d 249 [1974]). The panel pointed out that the insurer had "ample" time to complete its investigation after the policy-limit offer was made and that the lawsuit had not been filed "'precipitously'" as claimant's counsel had agreed to extend the time to settle. *Smith*, 14 Kan. App. 2d at 164.

Nancy fails to consider the context of the rule: that the insurer in *Smith* refused to pay a policy-limit offer before a lawsuit was filed and that filing suit was necessary. The rule does not apply here because Key had no pre-suit demand from Nancy that it refused to pay. As we have discussed, filing a lawsuit may not have been necessary to obtain the policy limit from Key. To be clear, this analysis is not stating that a claimant cannot make the first claim for damages from an insurer by filing a lawsuit. Instead, it is stating that if the claimant chooses that route, the claimant cannot rely on "having to file suit" as the justification for rejecting a post-suit policy-limit settlement offer.

Similarly, Nancy's argument that she reasonably rejected the post-suit policy-limit settlement offer because of the fees she incurred by filing the lawsuit is unpersuasive. Nancy testified that because she recovered from Key and State Farm—her own insurance company—after she sued, she now owed attorney fees. But Nancy only collected $50,000 from both companies. Even if she would need to pay one-third of that amount in attorney fees because a lawsuit had been filed, that expense does not explain why a claim she would have settled for $25,000 in June 2018 could only be settled for nearly $3 million in October 2018. The record does not reflect that Nancy incurred any significant litigation expense during those four months by taking depositions or hiring expert witnesses.

Before wrapping up this discussion on causation for the excess judgment, we are mindful that Nancy and her family sustained a horrific loss at the hands of Wilson, who had purchased a minimum coverage liability policy from Key. See K.S.A. 2020 Supp. 40-3107(e). The policy-limit offer made by Key after the lawsuit was filed could not begin to fully compensate Nancy for her damages. But the issue in this case is Key's contractual responsibilities to Wilson under the insurance policy. Nancy stands in the shoes of Wilson and can enforce an action against Key only to the extent that Wilson could enforce such an action. *Geer*, 309 Kan. at 191. Key is liable for a judgment in excess of the policy limit only if it breached a duty it owed to Wilson in settling the claim and there is a causal connection between Key's conduct and the excess judgment. *Bollinger*, 202 Kan. at 336-43; *Gruber*, 59 Kan. App. 2d at 315.

As mentioned earlier, this case is different from typical bad-faith or negligence claims against an insurer in that Nancy never made any demand for damages before filing her lawsuit, yet her entire bad-faith claim stems from Key's conduct before Nancy sued. Similarly, Key never refused to settle for policy limits, before or after the lawsuit was filed, believing it could do better at trial. Nancy filed her lawsuit 16 months before the statute of limitations would have expired, and she filed the suit without sending a demand letter to Wilson. Key made a policy-limit settlement offer six weeks later, but by that time Nancy had no intention to settle the case for any amount close to the policy limits.

Kansas law is clear that for an insurer to be liable for a judgment in excess of the policy limit, there must be a causal connection between the insurer's conduct and the excess judgment. *Gruber*, 59 Kan. App. 2d at 315. An insurer is not liable for a judgment entered against its insured unless the plaintiff can show the excess judgment is traceable to the insurer's conduct. 59 Kan. App. 2d at 315. Courts have held that an insurer is not the legal cause of an excess judgment when the claimant rejects a policy-limits settlement offer that he or she would have accepted earlier, solely to manufacture a bad-faith claim.

32

59 Kan. App. 2d at 315. "The plaintiff should be able to show why an offer that would have been good one day is not acceptable a short time later." 59 Kan. App. 2d at 316.

Again, we accept that Key violated its own standards and industry standards in investigating the accident. We also assume for this opinion that Key breached its duty to Wilson by failing to communicate with him and advise him about the risk of an excess judgment before Nancy filed her lawsuit. But Nancy has failed to show that Key's breach of its duty to communicate with Wilson is what caused the excess judgment. Instead, the record reflects that the excess judgment was more the result of Nancy's actions after the lawsuit was filed, rather than Key's conduct before the lawsuit was filed. Based on the undisputed facts in the record, and even taking Nancy's testimony that she would have settled pre-suit as credible evidence, this case resembles *Wade*, *Wiebe*, *Blanco-Diaz*, and *Kemp*, in which the courts found that the claimant's own arbitrary actions were the legal cause of the excess judgment. As a result, we hold Key's purported negligence or bad faith in handling the claim was not the legal cause of the excess judgment and the district court erred in entering judgment against Key in the garnishment action.

One final point. Although some courts have addressed the causation issue in terms of the claimant "manufacturing" a bad-faith claim, we refrain from using that term to describe Nancy's actions in this case. We need not find that Nancy intentionally set out to make Key liable for an excess judgment in order to conclude there is no causation here. Instead, we simply find that under the facts of this case, Key's conduct in handling the claim was not the legal cause of the excess judgment, and so the district court erred in entering judgment for Nancy against Key in the garnishment action.

DID THE DISTRICT COURT ERR IN FINDING KEY HAD NO AFFIRMATIVE DUTY TO INITIATE SETTLEMENT NEGOTIATIONS?

In her cross-appeal, Nancy contends the district court erred in finding Key owed no duty to pursue settlement on Wilson's behalf, and the court should have found Key breached that duty. To recap, the district court found Key had no affirmative duty to reach out to Nancy and initiate a settlement offer before she made a claim, even if directed by Wilson to do so, observing that "Key wouldn't have had to do that." Nancy challenges that finding and asserts that Key's failure to initiate settlement negotiations when it was clear Nancy had a policy-limit claim supports an excess judgment against Key. Key argues the district court correctly ruled it owed no duty to solicit a claim from Nancy against its own insured before Nancy asserted a claim against Wilson or Key.

The parties' arguments on this issue hinge on when an insurer's duty to act in good faith and without negligence begins. Key asserts that until a claimant makes a claim—meaning the claimant makes known to the insurance company that the claimant is seeking damages—it has no duties. Nancy counters that an insurance company owes duties to its insured once an accident has occurred because the claimant has a claim—meaning the claimant can, at any time from that point forward, demand damages.

As in the first issue, an appellate court determines whether the district court's findings of fact are supported by substantial competent evidence and whether the findings are sufficient to support the district court's conclusions of law. *Geer*, 309 Kan. at 190. An appellate court's review of conclusions of law is unlimited. 309 Kan. at 190-91.

Nancy is correct in asserting that panels of this court have cited the rule that an insurer has a duty to initiate settlement despite the actions of the injured party. For instance, in *Gruber* the panel summarized the law as:

"The insurer thus has a duty to settle if the insurer would start settlement negotiations on its own behalf were its potential liability equal to that of its insured. An insurer must exercise diligence and good faith in its efforts to settle damage claims within the policy limits. *Farmers Ins. Exchange v. Schropp*, 222 Kan. 612, Syl. ¶¶ 4-5, 567 P.2d 1359 (1977). The fiduciary relationship between the insurer and insured imposes a duty on the insurer to make reasonable efforts to negotiate a settlement. *The insurer has to begin settlement negotiations regardless of the actions of the injured party. Rector v. Husted*, 214 Kan. 230, 241-42, 519 P.2d 634 (1974); *Smith v. Blackwell*, 14 Kan. App. 2d 158, 163, 791 P.2d 1343 (1989). An insurer cannot cure its previous negligence or bad faith by offering the policy limit after commencement of a suit. *Blackwell*, 14 Kan. App. 2d at 163-64, 791 P.2d 1343." (Emphasis added.) *Gruber*, 59 Kan. App. 2d at 303.

But further investigation into the authorities relied on to support this rule suggest that the rule is not as broad as the cases would imply. We are aware of no controlling legal authority in Kansas that required Key to initiate settlement negotiations with Nancy before she made any claim for damages against Wilson or Key.

The "rule" that an insurer has a duty to initiate settlement originates from *Rector v. Husted*, 214 Kan. 230, 241-42, 519 P.2d 634 (1974). In *Rector*, the claimant was injured when the insured ran a stop sign and hit Rector's car. Claimant suffered back pain after the accident and saw various doctors. Claimant offered to settle for $6,000 throughout the trial but the insurer decided to take its chance with the jury, even though it knew the insured was liable and it knew claimant's medical expenses. The insurer only made one offer of $1,000 during the case. The court found that the record clearly established that the case was worth more than $1,000 because liability and damages were clear. 214 Kan. at 240. The court explained that the insurer, because of its fiduciary relationship with the insured, had a duty to make reasonable efforts to negotiate a settlement of the claim and the insurer breached that duty when it "elected to take their chances with the jury without reasonably attempting to negotiate a settlement." 214 Kan. at 241. The court explained it was not stating that the insurer had to settle for the $6,000 offered by claimant but,

35

"it was incumbent upon the appellant, with a claim involving admitted liability and permanent disability, to make a good faith attempt at negotiating a settlement. By taking a chance with the jury the appellant was exposing the insured to potential personal liability for an amount well above the policy limits. The action filed by the plaintiff sought damages in the amount of $25,000. Fair and equal consideration of the insured's vulnerable position demands that reasonable attempts be made to protect him from such exposure." 214 Kan. at 241-42.

A reading of the entire opinion in *Rector* establishes that the Kansas Supreme Court relied on the circumstances of the case to determine that the insurer did not make good-faith attempts to negotiate settlement when it rejected a post-suit offer from the claimant and instead chose to proceed to a jury. Notably, it is the dissent in *Rector* that interprets the opinion as imposing a duty to initiate settlement "when its insured is about to be sued by an injured third party." See 214 Kan. at 242 (Fromme, J., dissenting). But the opinion does not state such a broad rule, especially considering the facts of the case. Thus, it is unclear where the broader rule statement that the insurer has a duty to begin settlement negotiations regardless of the actions of the injured party—that panels of this court have attributed to *Rector*—came from. See *Blackwell*, 14 Kan. App. 2d at 163.

The other case Nancy cites in support of her argument is *Farmers Ins. Exchange v. Schropp*, 222 Kan. 612, 567 P.2d 1359 (1977). In *Schropp*, Clint R. Sohl, who was insured by Farmers Insurance Exchange (Farmers), hit a car that Michael D. Schropp was riding in. Schropp and other people involved in the crash sustained injuries. Schropp was in the hospital for 30 days and Farmers reached out to his mother asking for his medical bills so it could pay them. Schropp's attorney sent the bills, totaling around $9,000, and Farmers replied that it would be in touch regarding future settlement. The company did not contact Schropp and two months later Schropp sent another letter with more medical bills, exceeding $26,000, and demanding payment of the policy limit.

The Kansas Supreme Court summarized the rules surrounding an insurer's duty to its insured. It then quoted a Tenth Circuit case in which the Tenth Circuit stated that it believed under its reading of Kansas law, "'the duty to settle does not hinge on the existence of a settlement offer from the plaintiff. Rather, the duty to settle arises if the carrier would initiate settlement negotiations on its own behalf were its potential liability equal to that of its insured.'" 222 Kan. at 620 (quoting *Coleman v. Holecek*, 542 F.2d 532 [10th Cir. 1976]). The court found that the facts established that Farmers said it would be in touch regarding settlement, then never followed through; that it made no effort to work out a settlement with all claimants; and that when it received Schropp's demand for the policy limits it refused the settlement despite knowing its insured was liable and that Schropp's medical expenses exceeded its policy limits. The court also pointed out:

> "All but one of the claimants were represented by counsel, and that claimant sustained the least serious injuries of all, and had returned to military duty. He was a minor, and his parents were available for consultation. Under these circumstances, Farmers could well have notified all of the potential claimants involved that the value of the claims would doubtless exceed policy limits, and invite them or their attorneys to participate jointly in efforts to reach agreement as to the disposition of the available funds. Alternatively, Farmers could have attempted to settle claims within the policy limits as they were presented. Or as a third alternative, Farmers could have promptly and in good faith commenced an interpleader action, and paid its policy limits into court. The first of these alternatives is preferable, where the claimants are readily available, and such a procedure may avoid litigation. Farmers pursued none of these alternatives. [Citation omitted.]" 222 Kan. at 621.

Thus, the court upheld the jury's finding that Farmers acted negligently or in bad faith in handling the claims arising from the collision. 222 Kan. at 621.

Nancy asserts *Schropp* stands for the proposition "that when an insurer is aware of 'potential claimants,' and the insurer is aware that the value of the claim would likely exceed policy limits, the 'preferable' approach is for the insurer to reach out to the

37

claimants, even if it has not been contacted by the claimants." But as she notes, the court only stated such contact would have been preferable; it did not state that the insurer had a duty to do so. *Schropp*, 222 Kan. at 621. Further, the quote from the Tenth Circuit case stemmed from the statement from *Rector* that "'*the claim* should be evaluated by the insurer without looking to the policy limits and as though it alone would be responsible for the payment of any judgment rendered on the claim.'" (Emphasis added.) *Schropp*, 222 Kan. at 620 (quoting *Coleman* which quoted *Rector*).

In both *Rector* and *Schropp* the claimants demanded damages from the insured. Here Nancy never demanded the policy limit or any other damages until she sued. Thus, the authorities cited by Nancy do not support her broad assertion that an insurer must initiate settlement negotiations before a claimant even indicates a desire to pursue damages. In fact, these cases support the district court's finding. Once Key knew that Nancy was pursuing a claim, Key initiated settlement negotiations and offered its policy limit to settle. Thus, unlike the insurer in *Rector* who declined to settle after a lawsuit was filed and instead took its chances with the jury, Key tried to negotiate with Nancy to prevent the case from going forward and it was Nancy's rejection of that policy-limit offer that led to the excess judgment being entered.

Nancy then asserts an insurer's duties to its insured begin from the moment the accident occurs. In support, she cites *Jameson v. Farmers Mutual Automobile Ins. Co.*, 181 Kan. 120, 126-27, 309 P.2d 394 (1957), for its statement:

> "[A]n injured party . . . is generally under no obligation to give notice, [but] he could not
> recover under the policy unless he sees to it that the insurer is notified of the accident of
> suit. . . . In other words, it mattered not who gave the notice so long as notice was given
> and the insurer had actual notice thereby, giving it an opportunity to make an
> investigation and to defend the suit."

38

But the *Jameson* case focused on what effect the failure of the insured to forward suit papers had on the insurer's liability for a failure to defend the case. The statement Nancy relies on came in the court's general recitation of the notice an insurer must have before their duty to defend kicks in. *Jameson*, 181 Kan. at 127. But Nancy fails to recognize that in *Jameson*, the insurer was told of both the accident and pending suit and thus the insurer was liable: "Appellee had notice of *the pendency of the actions for damages* against the [insureds]; it was advised of the claims and knew of every step taken in the damage actions." (Emphasis added.) 181 Kan. at 127. Thus, the full authority, not the piecemeal quote Nancy presents, undermines her position.

Nancy also cites *Moses v. Halstead*, 581 F.3d 1248, 1255 (10th Cir. 2009), for the statement that "under Kansas law an insurance company has a 'duty to exercise reasonable care and good faith in efforts to settle a claim against its insured.' To trigger this duty, the insured need only put the insurer on notice of the claim. [Citation omitted.]" Based on this rule, the Tenth Circuit reasoned that the insurer had a duty to defend once the claimant's father "put the company on notice of the accident." 581 F.3d at 1255. But again, Nancy fails to recognize the context of this statement and that the authorities cited by the Tenth Circuit to support its assertion do not state that notice of an accident alone can trigger the duty to defend. First, the facts of *Moses* established that the claimant's father "reported the accident to Allstate, *requesting coverage for his daughter's injuries*." (Emphasis added.) 581 F.3d at 1250. Thus, claimant's father not only gave notice of the accident but simultaneously gave notice that claimant was seeking damages.

Second, and more importantly, the authorities cited by the Tenth Circuit to support its statement—that the "'duty to exercise reasonable care and good faith in efforts to settle a claim against its insured'" arises on notice of the claim—all support finding that the claimant must make some sort of "claim," whether that be a lawsuit or a demand on the insurer. See, e.g., *Am. Motorists Ins. Co. v. Gen. Host Corp.*, 946 F.2d 1489, 1490 (10th Cir. 1991) ("In determining whether the insured has a duty to defend, it is by now well-

recognized that 'we must examine the complaints in the[] underlying actions and decide whether there are any allegations that arguably or potentially bring the action within the protection purchased or a reasonable possibility that coverage exists.'"); *Bankwest v. Fid. & Deposit Co. of Maryland*, 63 F.3d 974, 981 (10th Cir. 1995) (finding insurer had duty to defend lawsuit because lawsuit alleged covered acts).

Nancy then cites two irrelevant cases. First, she cites *Henry Enterprises, Inc. v. Smith*, 225 Kan. 615, 620, 592 P.2d 915 (1979), for its quote:

> "An insurance company by the nature of its business is not called into action until one of its insured has suffered some form of injury and has a potential claim against some other party and/or the insurer itself. At this point, the insurer must conduct a review of the factual data underlying the claim . . . ." 225 Kan. at 620.

This excerpt does not help Nancy's case. First, the question in this case was whether statements of witnesses taken by claims adjusters or investigators were discoverable. Thus, the case was not discussing an insurer's duties at all. Second, the quote cited by Nancy is the Kansas Supreme Court's quoting of a federal district court case from Illinois which discussed the Federal Rules of Civil Procedure and whether documents written by insurance agents were discoverable. See 225 Kan. at 620 (quoting from *Thomas Organ Co. v. Jadranska Slobodna Plovidba*, 54 F.R.D. 367 [N.D. Ill. 1972]). And the Illinois case that provided the excerpt cited involved admiralty law and cargo loss, not an insurer's duties to its insured and not when a claimant can recover on a breach of those duties. See *Thomas Organ Co.*, 54 F.R.D. at 368 ("The plaintiff in this admiralty lawsuit seeks to recover damages for cargo loss.").

Second, Nancy cites *LaForge v. Am. Cas. Co. of Reading, Pennsylvania*, 37 F.3d 580 (10th Cir. 1994). This case discussed the difference between "claims made" policy coverage—where "coverage is only triggered when, during the policy period, an insured

40

becomes aware of and notifies the insurer of either claims against the insured or occurrences that might give rise to such a claim"—and an "occurrence" policy coverage—where coverage attached automatically on occurrence of a covered event. 37 F.3d at 583. Nancy then asserts, without citation to the record, that the insurance policy in this case was an occurrence policy and, thus, once the accident occurred, Key's duties kicked in. In the alternative, Nancy asserts even under the policy coverage definition, the accident here provided notice of the claim as the accident "might give rise" to a claim. But *LaForge* is unpersuasive because it speaks to when *coverage* is triggered. See 37 F.3d at 580-81. Here, there is no dispute that Wilson had coverage for the accident. Instead, the question in this case is when the insurer's duties to its insured, specifically the duty to initiate settlement negotiations, arises.

To summarize to this point, none of the cases relied on by Nancy persuasively establish that Key had a duty to initiate settlement negotiations with Nancy before she informed Key that she was requesting damages. While panels of this court have cited a rule that would on its face seem to support Nancy, the "rule" is not found in any of the caselaw cited to support such a proposition. Further, the context of the "rule" has always been applied after the claimant has at least made some indication that he or she was seeking damages from the insurance company. The rule does not state that an insurer must initiate settlement negotiations before the claimant makes any type of demand for damages. And Nancy cites no authority to support her assertion that Key had a duty to initiate settlement negotiations based solely on its notice of the occurrence of an injury accident caused by its insured. Instead, the authorities state that an insurer has a duty to defend *when a claim*—meaning some demand for damages or lawsuit—is made.

Turning to Key's arguments, Key asserts that *Roberts v. Printup*, 422 F.3d 1211 (10th Cir. 2005), supports its assertion that its good-faith duties only arise once a claim in excess of the policy limits is asserted. This *Roberts* case is a prior proceeding, an appeal from summary judgment, in the same *Roberts* case discussed earlier in this opinion. See

595 F.3d 1181. To summarize the facts again, Roberts obtained an insurance policy from Shelter for her new car—titled and registered to both her and her 16-year-old son, Patrick Printup—where she was the insured and Printup was an insured driver. Printup was driving and Roberts was a passenger when the brakes failed, and the car struck a pole. Roberts' medical bills exceeded $125,000. They reported the accident to Shelter, who coded the accident as a one-car collision with the insured at fault. Roberts told Shelter that Printup did everything he could when the brakes failed so Shelter had no reason to believe a liability claim against Printup was imminent. Roberts submitted her first medical bills and Shelter paid out the personal injury protection limit.

Roberts later consulted with an attorney and sent a letter to Shelter seeking to settle all her claims for the policy limit of $25,000. When Shelter did not accept the settlement, she sued her son. Roberts obtained a judgment against Printup for more than $1 million. Roberts then sought to collect from Shelter, alleging it acted negligently or in bad faith by failing to investigate, failing to evaluate the claim, failing to properly document claim activity, failing to train and supervise claim personnel, failing to give equal consideration to the interest of its insured, failing to initiate negotiations from settlement when liability was "reasonably clear," and failing to accept or respond to time sensitive settlement offers. 422 F.3d at 1214. The district court granted summary judgment to Shelter on all claims and Roberts appealed.

On appeal, Roberts claimed that Shelter had a duty to initiate settlement when the accident was reported. The Tenth Circuit acknowledged that Kansas law "under certain circumstances" imposes a duty on the insurer to initiate settlement negotiations even without an offer being made by the claimant. 422 F.3d at 1215. But the court pointed out that there must be some indication that a claim was being made before the insurer had a duty to settle. 422 F.3d at 1216. The court cited and quoted from *Sloan*, stating:

"[T]he Kansas Supreme Court rejected the argument that 'any time an insurance agent acquires knowledge of some injury to a policyholder it becomes the company's duty to initiate an investigation and offer a settlement . . . without any claim being made. . . .' Instead, the court found that 'the insured has some duty to give notice to his company of his loss, and of the fact that he is making a claim under his policy before the company is obligated to move.'" *Roberts*, 422 F.3d at 1216 (quoting *Sloan*, 214 Kan. at 445).

Nancy asserts that *Sloan*, which *Roberts* relied on, is distinguishable and thus makes *Roberts* unpersuasive. In *Sloan*, the Kansas Supreme Court considered whether Sloan's insurance company refused to pay Sloan's loss without just cause or excuse which would cause the insurance company to be liable for attorney fees. 214 Kan. at 443. Sloan claimed damages against his insurance company under his uninsured motorist policy for damage to his truck, medical expenses, and personal injuries. The court noted that the statute discussed assessing attorney fees when an insurance company "'refused' to pay" which the court explained meant a demand had been denied. 214 Kan. at 444. The court pointed out that Sloan's first notice of injury came in the form of a letter submitted to his insurance company a year after the accident. But Sloan argued the insurance company had earlier notice of his injuries because he did yard work for the insurance agent before the accident, and after the accident, he was no longer able to do the agent's yardwork. In addressing this personal knowledge argument, our Supreme Court stated:

"If, by this contention, plaintiff means to suggest that any time an insurance agent acquires knowledge of some injury to a policyholder it becomes the company's duty to initiate an investigation and offer a settlement—without any claim being made—we reject the suggestion. We believe the insured has some duty to give notice to his company of his loss, and of the fact that he is making a claim under his policy, before the company is obligated to move. In this case we cannot convert whatever knowledge Luckey may have had of plaintiff's condition into a claim against the company under plaintiff's uninsured motorist coverage." 214 Kan. at 445-46.

43

Nancy is correct that *Sloan* deals with a claim from the insured against his insurer, while Nancy's case deals with a claim from a third party. But this distinction does not undermine the application of *Sloan* and *Roberts*. The crux of the paragraph in *Sloan* was that unofficial notice of an injury alone is not enough to require an insurance company to act on a claim. Instead, the insurance company must have some official notice of an injury *and* some indication that the injured party sought to be paid under the insurance policy for those injuries. As Nancy points out, Key had official notice—from Wilson—of the accident and that Francisco had died. But Nancy never gave any indication that she was seeking damages from Key. If an insured cannot recover from his or her own insurance policy without providing notice that he or she is in fact seeking damages, then likewise a third-party claimant cannot recover from an insurance company without providing some notice to the insurer that the claimant is seeking damages.

To wrap up this lengthy discussion of the caselaw, Nancy's case provides a good example of why an insurer owes no affirmative duty to initiate settlement negotiations with a potential claimant until the claimant makes some type of claim or demand for damages against the insurer. In December 2017, about two months after the car accident, Elkins, Wilson's passenger, presented a demand to settle his claim against Key for the injuries he sustained in the accident. Key promptly settled the claim and paid Elkins the policy limits of $25,000. As Gragson testified at the garnishment hearing, Key was prepared to settle Nancy's case the same way when she made a demand for damages. But Key's first indication Nancy was making a demand for damages was the lawsuit. When Key received notice of the lawsuit, it promptly offered to settle for the policy limits. But Nancy rejected that offer, making it clear that she intended to pursue a claim against Key for its alleged negligence and bad faith in handling the claim.

Nancy cites cases from our court for the general proposition that an insurer has a duty to initiate settlement despite the actions of the injured party and that the duty to settle does not hinge on a settlement offer from the claimant. But a close reading of these

44

cases does not support Nancy's assertion that under the facts presented here, Kansas law required Key to initiate a settlement offer to Nancy after Key received notice of the accident but before Nancy made any claim for damages against Key. Although an insurer must exercise diligence and good faith in its efforts to settle claims within the policy limits, we hold an insurer owes no affirmative duty to initiate settlement negotiations with a third party before the third party makes a claim for damages. The district court did not err in making this finding in evaluating Nancy's claim.

CONCLUSION

The district court disregarded the proper analysis when it failed to consider all the *Bollinger* factors in deciding whether Key breached its duty to exercise good faith or act without negligence in handling the claim. But more importantly, the district court failed to engage in the proper causation analysis in finding Key liable for the judgment. Nancy has failed to show that Key's breach of its duty to communicate with Wilson is what caused the excess judgment. Based on the undisputed facts in the record, and without reweighing any evidence or reassessing the credibility of any witnesses, we find that the excess judgment was more the result of Nancy's actions after the lawsuit was filed, rather than Key's conduct before the lawsuit was filed. Finally, under the facts of this case, the district court did not err in finding Key owed no affirmative duty to initiate settlement negotiations with Nancy before she made a claim for damages. As a result, we reverse the district court's judgment for Nancy in the garnishment action and remand with directions to enter judgment for Key.

Reversed and remanded with directions.

45